*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Nogin, Inc., *et al.*, | ) | Case No. 23-11945 (CTG) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
## OF NOGIN, INC. AND ITS DEBTOR AFFILIATES

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
John H. Knight
Michael J. Merchant
David T. Queroli
Matthew P. Milana
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:   (302) 651-7701

*Attorneys for Debtors
and Debtors in Possession*

Dated:  January 22, 2024
            Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification number are: Nogin, Inc. (0703); Nogin Commerce, Inc. (0719); Native Brands Group LLC (0504).  The mailing address for the Debtors is 105 E. 34th St., Suite 137, New York, NY 10016.

**YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THIS DISCLOSURE STATEMENT AND THE JOINT CHAPTER 11 PLAN OF NOGIN, INC. AND ITS DEBTOR AFFILIATES (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), INCLUDING THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

**IF YOU FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN, A HEARING WILL BE HELD ON FEBRUARY 29, 2024 AT 10:00 A.M. PREVAILING EASTERN TIME, AT WHICH YOU WILL BE REQUIRED TO APPEAR.**

## RECOMMENDATION BY THE DEBTORS

**The Debtors recommend that the Plan be approved by the Court. The Ad Hoc Committee of Noteholders and the Plan Sponsor are supportive of the Plan.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS. HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ BOTH THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VII OF THIS DISCLOSURE STATEMENT.**

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED CREDITOR RECOVERIES, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN SECTION VII OF THIS DISCLOSURE STATEMENT.**

**THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE COURT (AS DEFINED BELOW).**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN WILL BE HELD BEFORE THE HONORABLE CRAIG T. GOLDBLATT, UNITED STATES BANKRUPTCY JUDGE, AT THE UNITED STATES COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 3RD FLOOR, COURTROOM NO. 7, WILMINGTON, DELAWARE 19801, ON FEBRUARY 29, 2024 AT 10:00 A.M. (PREVAILING EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.**

**THE COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE FEBRUARY 22, 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL GOVERN.**

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1
    A.    Background and Overview of the Plan ............................................................ 1
    B.    Summary of Plan Classification and Treatment of Claims ........................... 3
    C.    Summary of Plan Releases and Exculpation Provisions ............................... 7
    D.    Inquiries ...................................................................................................... 10

II. THE DEBTORS' BUSINESS ................................................................................. 10
    A.    History ......................................................................................................... 10
    B.    Property and Business Operations ............................................................... 11

III. DEBTORS' CORPORATE AND CAPITAL STRUCTURE .............................. 13
    A.    Corporate Structure ..................................................................................... 13
    B.    Corporate Governance and Management ..................................................... 14
    C.    Prepetition Capital Structure ....................................................................... 15

IV. SIGNIFICANT EVENTS LEADING TO THE CHAPTER 11 FILING ............ 17
    A.    Need for Additional Capital to Support Growth ......................................... 17
    B.    Prepetition Marketing Effort ....................................................................... 18
    C.    Formation of the Strategic Transactions Committee .................................... 19
    D.    The Restructuring Support Agreement ........................................................ 19

V. OVERVIEW OF CHAPTER 11 CASES ................................................................ 22
    A.    Commencement of Chapter 11 Cases .......................................................... 22
    B.    Appointment of Creditors' Committee ........................................................ 23
    C.    Statements and Schedules and Claims Bar Date.......................................... 23
    D.    Bidding Procedures...................................................................................... 24

VI. SUMMARY OF PLAN ......................................................................................... 25
    A.    Administrative and Priority Claims............................................................. 25
    B.    Classification and Treatment of Claims and Interests ................................. 28
    C.    Means for Implementation............................................................................ 32
    D.    Treatment of Executory Contracts and Unexpired Leases .......................... 43
    E.    Provisions Governing Distributions ............................................................ 46
    F.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ............ 49
    G.    Settlement, Release, Injunction, and Related Provisions ............................ 51
    H.    Conditions Precedent to Consummation of the Plan.................................... 54
    I.    Modification, Revocation, or Withdrawal of The Plan ................................ 55
    J.    Retention of Jurisdiction .............................................................................. 56

K.      Miscellaneous Provisions ..................................................................... 58

**VII. CERTAIN RISK FACTORS TO BE CONSIDERED** .............................................. 62

A.      Certain Bankruptcy Law Considerations ................................................ 62

B.      Additional Factors ................................................................................. 63

**VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN** ............................. 64

A.      Consequences to Debtors ....................................................................... 65

B.      Tax Treatment of a Liquidating Trust and Liquidation Trust Beneficiaries ........... 66

C.      Tax Treatment of a Liquidating Trust and Liquidation Trust Beneficiaries ........... 67

D.      Withholding on Distributions and Information Reporting ......................... 69

**IX.     VOTING PROCEDURES AND REQUIREMENTS** ............................................. 69

A.      Voting Instructions and Voting Deadline ................................................ 70

B.      Parties Entitled to Vote .......................................................................... 70

C.      Agreements Upon Furnishing of Ballots ................................................. 71

D.      Change of Vote ...................................................................................... 71

E.      Waivers of Defects, Irregularities, Etc. .................................................. 72

F.      Further Information, Additional Copies .................................................. 72

**X. CONFIRMATION OF PLAN** ........................................................................... 72

A.      Confirmation Hearing ............................................................................ 72

B.      Objections to Confirmation and Final Approval of Disclosure Statement ........... 72

C.      Requirements for Confirmation of Plan .................................................. 75

(i)     Requirements of Section 1129(a) of Bankruptcy Code .......................... 75

(ii)    Additional Requirements for Non-Consensual Confirmation Under Section 1129(b) of the Bankruptcy Code .................................................. 77

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** ........................ 78

A.      Alternative Plan ..................................................................................... 78

B.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law .................... 78

**XII. CONCLUSION AND RECOMMENDATION** ..................................................... 79

EXHIBIT A:     Plan

EXHIBIT B:     Organizational Structure Chart

EXHIBIT C:     Liquidation Analysis

# I.
# INTRODUCTION

### A.    Background and Overview of the Plan

Nogin, Inc. ("**Nogin**") and its debtor affiliates (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") submit this disclosure statement (as may be amended or supplemented from time to time, the "**Disclosure Statement**") related to the *Joint Chapter 11 Plan of Nogin, Inc. and Its Debtor Affiliates*, dated December 18, 2023 (the "**Plan**"),[1] attached hereto as **Exhibit A**.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events that precipitated and that are contemplated in these Chapter 11 Cases that commenced on December 5, 2023 (the "**Petition Date**"), and certain documents related to the Plan.  As described more fully herein, in the months leading up to the commencement of these Chapter 11 Cases, the Debtors were faced with certain financial and industry challenges. Consequently, during the summer of 2023, the Debtors began to explore possible non-chapter 11 restructuring alternatives, including capital raises, business combinations and other restructuring alternatives, in an effort to revitalize their balance sheets and operations.  To that end, as described more fully herein, the Debtors retained two leading financial advisory firms, one of which was B. Riley Securities ("**BR Securities**"), to gauge market interest in a variety of restructuring transactions.

As the Debtors continued to explore their restructuring options in the summer and early fall 2023, their liquidity projections forecasted a near term liquidity crunch by mid November 2023.  Thus, having not yet obtained a viable path for an out-of-court restructuring, the Debtors began considering the prospect of pursuing a sale process under chapter 11 of the Bankruptcy Code.  Accordingly, on October 20, 2023, the Company's management contacted B. Riley Principal Investments ("**BR Investments**"), an affiliate of BR Securities, to gauge its interest in providing debtor-in-possession financing and pursuing a sale transaction under chapter 11 of the Bankruptcy Code.   Following a series of discussions between the parties, on November 2, 2023, BR Investments provided the Debtors with a non-binding term sheet, dated October 31, 2023 (the "**BRI Term Sheet**"), proposing a potential transaction.

While the Debtors continued their outreach to other prospective investors and business partners, BR Investments was the only party that expressed an interest in pursuing a restructuring transaction that would address the Debtors' near- and long-term liquidity needs.  Accordingly, the Debtors, BR Investments and an ad hoc committee of holders of the Senior Notes (the "**Ad Hoc Committee of Noteholders**") began a series of intensive arm's length negotiations regarding the framework for a consensual chapter 11 proceeding.

In connection with reviewing, evaluating and negotiating strategic alternatives, including those contemplated by and between the Company, BR Investments and the Ad Hoc Committee of Noteholders, the board of directors of the Company (the "**Nogin Board**") established, and delegated its authority to, a committee of three independent directors (the "**Strategic Transaction Committee**").  Among other things, the Strategic Transactions Committee has the power to consider, review, evaluate and determine whether to approve any proposed transactions submitted to the Company or the Board or any alternatives thereto, including those proposed under the RSA (as defined herein).

---

[1] Capitalized terms used in this Disclosure Statement, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.  For purposes of this Article 1.A, Background and Overview of the Plan, undefined terms shall have the meanings ascribed to such terms in the body of the Disclosure Statement.

On November 16, 2023, after hard fought and good faith negotiations between the Company, BR Investments and the Ad Hoc Committee of Noteholders, the Strategic Transactions Committee approved that certain *Chapter 11 Restructuring Support Agreement*, dated November 16, 2023, by and between the Company, BR Investments and the Ad Hoc Committee of Noteholders (the "**RSA**").

As discussed more fully herein, the RSA provides the framework for the commencement of these Chapter 11 Cases, obtaining debtor-in-possession financing, and commencing a postpetition marketing process to provide a market-check for the Restructuring Transactions contemplated under the RSA. The RSA Parties (as defined below) have agreed that the proposed Restructuring Transactions contemplated under the RSA shall be subject to higher and better offers through a Court-approved auction process, with the Debtors having a "fiduciary out" allowing them to pursue alternative transactions that would be consistent with their fiduciary obligation to maximize value for the benefit of their stakeholders. While the Debtors' prepetition efforts did not yield any additional binding offers, the Debtors have retained Livingstone Partners LLC ("**Livingstone**") to serve as investment banker to the Debtors in overseeing a postpetition marketing process intended to serve as a market-check on the Plan. With respect to the postpetition sale process, through the RSA, the Plan Sponsor will act as the *de facto* Stalking Horse Bid under the Debtors' proposed Bidding Procedures. The Stalking Horse Bid is designed to establish an adequate floor from which the Debtors will endeavor to solicit higher and better bids in a competitive auction process.

Material terms of the Restructuring Transactions contemplated by the RSA and embodied under the Plan include, among other things:

- On the Effective Date, among other consideration to be provided, the DIP Claims will either equitize into 100% ownership of the Reorganized Equity Interests in the "Reorganized Debtors" or will be used to acquire all or substantially all of the Debtors' Assets;

- On the Effective Date, except to the extent a Senior Noteholder agrees to less favorable treatment, each Senior Noteholder shall receive its Pro Rata share of the Cash Settlement Consideration plus its Pro Rata share of Creditor Litigation Trust Beneficial Interests. In the event the Senior Notes Recovery exceeds the Allowed Senior Notes Claims, Holders of Allowed General Unsecured Claims would receive, on a Pro Rata basis, their share of the Excess Recovery;

- Establishment of the Creditor Litigation Trust consisting of (a) the Retained Causes of Action, including any and all proceeds thereof, together with all privileges related thereto (including, but not limited to, any lawyer client and work product privileges), and the Creditor Litigation Trust Initial Funding Amount, if any, (b) all Assets of the Estates that are (i) not transferred to the Buyer, (ii) not transferred to the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable; (iii) not the Professional Fee Account, and (iv) not Distributed to Holders of Claims on the Effective Date, (c) rights of access to all of the Debtors' books and records relating to periods ending on or before the Effective Date, and (d) the proceeds from any recovery under the D&O Liability Insurance Policies providing coverage for any Retained Causes of Action;

- Establishment of the Debtor Liquidating Trust consisting of (a) the Debtor Liquidating Trust Initial Funding Amount and (b) all Assets not transferred to the Buyer or the Creditor Litigation Trust; or the Post-Effective Date Debtor(s) consisting of (x) the Post-Effective Date Debtor Initial Funding Amount and (b) all Assets not transferred to the Buyer or the Creditor Litigation Trust; and

- On the Effective Date, (i) BR Investments and its Affiliates and (ii) the Ad Hoc Committee of Noteholders and their members, affiliates, and professionals shall receive a release of all estate claims and causes of action.

2

The Debtors' overriding goal in these Chapter 11 Cases is to maximize the value of their estates and for the benefit of the Debtors' stakeholders. Accordingly, during the post-petition marketing process, bids may be structured as an Asset Sale Transaction or an acquisition of the Reorganized Equity Interests in the Reorganized Debtors. The Debtors anticipate seeking approval of the Successful Bid in connection with confirmation of the Plan, as the Plan affords the flexibility necessary to incorporate the Successful Bid regardless of the structure of the transaction. Further, the Debtors will also treat the Confirmation Hearing as a Sale Hearing in the event the Successful Bidder prefers consideration of an Asset Sale Transaction separate from the Plan pursuant to a Sale Order under section 363 of the Bankruptcy Code.

The Debtors believe that their Cash on hand and the Sale Transaction Proceeds will provide adequate sources of consideration to fund the payments under the Plan. Accordingly, the Debtors believe that the transactions discussed herein and embodied in the Plan maximize value for their estates and creditors while simultaneously bringing these Chapter 11 Cases to an expeditious and fair resolution.

### B.    Summary of Plan Classification and Treatment of Claims

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Only Holders of Claims in Class 3 - Senior Notes Claims are being solicited under, and are entitled to vote on, the Plan (the "**Voting Class**").

The following table summarizes (i) the treatment of Claims and Interests that are classified under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes, if any, are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests under the Plan. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article VI—Summary of the Plan below.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Allowed Claim Amount | Approximate Recovery Under Plan |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Priority Non-Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, compromise, | Unimpaired | No (Presumed to Accept) | $0.00 | 100% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Allowed Claim Amount | Approximate Recovery Under Plan |
|---|---|---|---|---|---|---|
| | | settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash in an amount equal to the Allowed amount of such Claim. | | | | |
| 2 | Other Secured Claims | Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Other Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, at the discretion of the Distribution Agent (x) payment in full in Cash in an amount equal to the Allowed amount of such Claim; (y) such other treatment sufficient to render such Other Secured Claim Unimpaired; or (z) return of the applicable collateral or authorization of a setoff in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired | No (Presumed to Accept) | $0.00 | 100% |
| 3 | Senior Notes Claims | Except to the extent a Holder of an Allowed Senior Notes Claim agrees to less favorable treatment, in full and final satisfaction of their Allowed Senior Notes Claims, on the Effective Date, Holders of Allowed Senior Notes Claims shall receive:<br>(i)    In the event that the Debtors pursue the transactions contemplated by the RSA and embodied in the Restructuring Term Sheet, and the Buyer is the Plan Sponsor purchasing the Reorganized Equity | Impaired | YES | $67,856,181 less holdings of Debtors' Chief Executive Officer as of the Petition Date | 23.7% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Allowed Claim Amount | Approximate Recovery Under Plan |
|---|---|---|---|---|---|---|
| | | Interests pursuant to an Equity Purchase Agreement, Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date) shall receive their Pro Rata share of (a) the Cash Settlement Consideration and (b) their Pro Rata share of the Creditor Litigation Trust Beneficial Interests.<br><br>(ii)  In the event that the Debtors pursue an Alternative Restructuring, whether pursuant to an Equity Purchase Agreement or an Asset Purchase Agreement, whether pursuant to this Plan or a Sale Order, and the Buyer is an entity other that the Plan Sponsor, Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date) shall receive (i) the greater of their Pro Rata share of the (a) Cash Settlement Consideration or (b) Net Cash Proceeds; *provided* that if the Alternative Restructuring does not provide Equivalent Noteholder Treatment, the RSA has not been terminated pursuant to Section 13.01(g), (j) or (a) (resulting from a material breach by the Required Consenting Noteholders or the Ad Hoc Committee of Noteholders acting at the direction of the Required Consenting Noteholders) thereof and the Plan Sponsor Excusal Condition has not been satisfied, then, within 14 days after consummation of such Alternative Restructuring, the Plan Sponsor shall pay the Cash Settlement Differential to the Indenture Trustee for the benefit of the Holders of Allowed Senior Notes Claims (other than the | | | | |

5

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Allowed Claim Amount | Approximate Recovery Under Plan |
|---|---|---|---|---|---|---|
| | | Debtors' Chief Executive Officer as of the Petition Date); and (ii) their Pro Rata share of the Creditor Litigation Trust Beneficial Interests. (iii)    In accordance with the RSA, (i) the Debtors' Chief Executive Officer as of the Petition Date shall receive no recovery on account of his Senior Notes Claims and (ii) as a class, Holders of Allowed Senior Notes Claims in Class 3 shall only be entitled to receive the full amount of the Senior Notes Claims, with interest to the extent permitted under the Bankruptcy Code, in accordance with the absolute priority rule.  To the extent, if any, that the Senior Notes Recovery exceeds the amount of the Allowed Senior Notes Claims, with interest as allowed by the Bankruptcy Code, the Excess Recovery, if any, shall be distributed on a Pro Rata basis to the Holders of Allowed General Unsecured Claims.  To the extent not otherwise paid, Holders of Allowed Senior Notes Claims shall receive an amount equal to the outstanding reasonable and documented Indenture Trustee Fees and Expenses and the outstanding reasonable and documented Consenting Noteholder Group Advisors Fees and Expenses, which amount will be paid to the Indenture Trustee or the applicable Consenting Noteholder Group Advisor on the Effective Date in cash as provided in Articles II.E and II.F of the Plan. | | | | |
| 4 | General Unsecured Claims | On the Effective Date, (i) each Allowed General Unsecured Claim will be released and extinguished, and (ii) each holder of an Allowed General Unsecured | Impaired | No (Deemed to Reject) | $35,000,000 | 0% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Estimated Allowed Claim Amount | Approximate Recovery Under Plan |
|---|---|---|---|---|---|---|
| | | Claim shall not receive any distribution on account of its General Unsecured Claim, unless the Senior Notes Recovery exceeds the Allowed Senior Notes Claims, which, in such circumstance, Holders of Allowed General Unsecured Claims would receive, on a Pro Rata basis, their share of the Excess Recovery, if any. | | | | |
| 5 | Intercompany Claims | Intercompany Claims shall be reinstated, cancelled, compromised, or provided such other treatment as determined by the Reorganized Debtors or the Buyer, as applicable. | Unimpaired | No (Presumed to Accept or Deemed to Reject) | N/A | 0%-100% |
| 6 | Existing Equity Interests | On the Effective Date, Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise; provided, however, that, in the event the Debtors consummate an Equity Sale Transaction pursuant to an Equity Purchase Agreement, the Reorganized Debtors' corporate structure shall be reflected in the Restructuring Steps Memorandum and shall not otherwise be adversely affected by the Plan. | Impaired | No (Deemed to Reject) | N/A | 0% |

### C.    Summary of Plan Releases and Exculpation Provisions

THE PLAN SEEKS A CONSENSUAL RELEASE OF CLAIMS THAT YOU MAY HOLD AGAINST THE RELEASED PARTIES.  YOU MAY BE AFFECTED BY SUCH RELEASES AND INJUNCTIONS IN THE PLAN. YOU SHOULD CAREFULLY REVIEW ARTICLE VIII OF THE PLAN AND THIS SECTION OF THE DISCLOSURE STATEMENT TO SEE IF AND HOW YOUR RIGHTS MAY BE AFFECTED.  IF YOU OBJECT TO SUCH RELEASES OR INJUNCTIONS, YOU MUST FILE AN OBJECTION TO THE PLAN IN ACCORDANCE WITH THE PROCEDURES SET FORTH HEREIN.  FAILURE TO OBJECT TO THE PLAN MAY RESULT IN SUCH RELEASES BEING APPROVED BY THE BANKRUPTCY COURT.

i.        **Debtor Release**

**As of the Effective Date, except as otherwise expressly set forth herein or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Plan and the transactions contemplated thereby, on and after the Effective Date, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, and the Debtors' Estates from any and all Claims, interests (including Interests), obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), Liens, remedies, losses, contributions, indemnities, costs, and liabilities whatsoever, including any derivative Claims, such as those asserted or assertable on behalf of the Debtors, or the Debtors' Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law, equity, contract, tort, or otherwise, by statute, violations of federal, state, provincial, foreign, or territorial securities law, or otherwise that the Debtors, or the Debtors' Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, or the Debtors' Estates, their Chapter 11 Cases, the purchase, sale, issuance, cancellation or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Debtors' Chapter 11 Cases, the Restructuring Support Agreement, the Definitive Documents and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof (including the Sale Order, if any), the solicitation of votes with respect to the Plan, or any other act or omission, or any other relief obtained by the Debtors in their Chapter 11 Cases, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, that, nothing in this Plan shall be construed to release (i) the Released Parties from intentional fraud, willful misconduct, or gross negligence as determined by a Final Order or (ii) the Back-Up Bidder, if any, from its obligations under the terms of the Sale Transaction Documents unless and until the Successful Bid is consummated, and provided further that nothing in Article VIII.E.1. of the Plan shall act as a release of a direct claim any holder of a Claim or Interest may have against a Released party. The Debtors, and the Debtors' Estates shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Plan. For the avoidance of doubt, nothing in this Plan shall release any current or former Affiliate, or Insider of the Debtors from any Retained Causes of Action and no current and former Affiliate or Insider of the Debtors will be a Released Party unless consented to in writing by the Required Consenting Noteholders, except for the attorneys, accountants, investment bankers, consultants and other professionals of the Debtors specifically named in the definition of Released Party.**

ii.        **Releases by Releasing Parties**

As of the Effective Date, except as otherwise expressly set forth herein or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Plan and the transactions contemplated thereby, on and after the Effective Date, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Releasing Parties from any and all Claims, interests (including Interests), obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), Liens, remedies, losses,

contributions, indemnities, costs, and liabilities whatsoever, including any derivative Claims, such as those asserted or assertable on behalf of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Debtors' Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law, equity, contract, tort, or otherwise, by statute, violations of federal, state, provincial, foreign, or territorial securities law, or otherwise that such Releasing Parties or their Affiliates would have been legally entitled to assert against any of the Released Parties in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person or entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, the Buyer, or the Debtors' Estates, their Chapter 11 Cases, the purchase, sale, issuance, cancellation or rescission of the purchase or sale of any Security of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between the Debtors and any Released Party, the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Debtors' Chapter 11 Cases, the Restructuring Support Agreement, the Definitive Documents and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof (including the Sale Order, if any), the solicitation of votes with respect to the Plan, or any other act or omission, or any other relief obtained by the Debtors in their Chapter 11 Cases, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, that, nothing in this Plan shall be construed to release (i) the Released Parties from intentional fraud, willful misconduct, or gross negligence as determined by a Final Order or (ii) the Back-Up Bidder, if any, from its obligations under the terms of the Sale Transaction Documents unless and until the Successful Bid is consummated.   The Releasing Parties shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under the Plan against each of the Released Parties. For the avoidance of doubt, nothing in this Plan shall release any current or former Affiliate, or Insider of the Debtors from any Retained Causes of Action or any direct claims which a direct or beneficial holder of the Senior Notes may have against an Insider or Affiliate of the Debtors who is not a Released Party; and no current or former Affiliate or Insider of the Debtors will be a Released Party unless consented to by the Required Consenting Noteholders, except for the attorneys, accountants, investment bankers, consultants and other professionals of the Debtors specifically named in the definition of Released Party.

> *iii.*    **Exculpation**

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim arising from an action or omission taking place between the Petition Date and the Effective Date of the Plan in connection with or arising out of the administration of the Chapter 11 Cases, the postpetition marketing and sale process, the purchase, sale, or rescission of the purchase or sale of any Security or Asset of the Debtors; the negotiation and pursuit of the Sale Order (if any), Disclosure Statement, or the Sale Transaction and Sale Transaction Documents, as applicable, the Plan, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, willful misconduct, or gross negligence, as determined by a Final Order.   This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.

D.      **Inquiries**

If you have any questions regarding the packet of materials you have received, please contact Donlin, Recano & Company, Inc. ("**DRC**"), the Debtors' voting agent (the "**Voting Agent**") at (i) 1-877-739-9988 (toll free in the U.S.) or 1-212-771-1128 (international), (ii) by email at nogininfo@drc.equiniti.com, or (iii) by writing to Donlin, Recano & Company, Inc, c/o Equiniti, Re: Nogin, Inc., *et al.,* 48 Wall Street, 22nd Floor, New York, NY 10005. Additional copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed), are also available on the Voting Agent's website at https://www.donlinrecano.com/nogin. **PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT**.

## II.
## THE DEBTORS' BUSINESS

A.      **History**

Founded in 2010, the Debtors are an e-commerce, technology platform provider, enabling business-to-consumer ("**B2C**") and business-to-business commerce for companies in a variety of industries, including apparel, accessories, and other consumer products. The Debtors' Commerce-as-a-Service ("**CaaS**") platform delivers an integrated set of technologies that provide their clients with enterprise-level capabilities, enabling them to compete in a highly competitive digital commerce environment dominated by a handful of large, well-resourced retailers and marketplaces.

1.      *The Business Combination and PIPE Agreement*

In February 2022, Nogin (known at the time as Software Acquisition Group, Inc. III ("**SWAG**")) entered into an *Agreement and Plan of Merger* (as amended, the "**Merger Agreement**") with Nuevo Merger Sub, Inc., a wholly-owned subsidiary of SWAG ("**Merger Sub**"), and Branded Online, Inc. (now known as Legacy Commerce) ("**Legacy Nogin**")). Pursuant to the Merger Agreement, Merger Sub would merge with and into Legacy Nogin, with Legacy Nogin surviving the merger as a wholly-owned subsidiary of Nogin (the "**Business Combination**"). In connection with the Business Combination, SWAG changed its name to "Nogin, Inc." and Branded Online, Inc. changed its name to "Nogin Commerce, Inc."

In August 2022, Nogin and a subscriber (the "**Equity Subscriber**") entered into a subscription agreement (the "**Equity PIPE Subscription Agreement**") pursuant to which Nogin agreed to issue and sell to the Equity Subscriber, immediately prior to the closing of the Business Combination, 517,079 shares of common stock. On August 26, 2022, immediately prior to the Closing Date (as defined below), Nogin issued (i) 517,079 shares of common stock to the Equity Subscriber in accordance with the terms of the Equity PIPE Subscription Agreement, (ii) $65.5 million aggregate principal amount of Senior Notes to the subscribers in accordance with the terms of the PIPE Subscription Agreements, and (iii) 1,369,419 PIPE Warrants to the subscribers in accordance with the terms of the PIPE Subscription Agreements.

Further, on August 26, 2022 (the "**Closing Date**"), pursuant to the Merger Agreement, Merger Sub merged with and into Legacy Nogin, with Legacy Nogin surviving the merger as a wholly-owned subsidiary of Nogin. As a result of the Business Combination, Nogin received proceeds of approximately $65.5 million from the contemporaneous issuance of 7% Convertible Senior Notes due in 2026 (the "**Senior Notes**") plus non-redemptions by SWAG's public shareholders, which were used by Nogin for general business

purposes, the paydown of Legacy Nogin's outstanding debt, and the payment of transaction costs and cash consideration to equity holders of Legacy Nogin.

### 2.    *The Joint Ventures*

Native Brands Group LLC ("**Native Brands**") owns interests in certain non-debtor joint ventures (collectively, the "**Joint Ventures**"), namely ModCloth, IPCO and Bicoastal (each as defined below). None of the Joint Ventures are borrowers or guarantors under the Senior Notes.

In April 2021, Native Brands and Tiger Capital Group, LLC ("**Tiger Capital**") (an entity not affiliated with the Debtors) formed ModCloth Partners, LLC, a Delaware limited liability company ("**ModCloth**"), with Native Brands then owning fifty (50) percent of the outstanding membership interests in the joint venture. Tiger Capital provided the financing for the inventory, while the Debtors entered into a Master Services Agreement with ModCloth to provide the CaaS Platform and eCommerce services. On December 1, 2022, Tiger Capital assigned its interest in ModCloth to Native Brands for $1.5 million, at which point ModCloth became a wholly-owned subsidiary of Native Brands. ModCloth was formed for the purpose of owning the ModCloth Brand, a uniquely styled indie and vintage-inspired women's clothing line. As described below, ModCloth's ownership interest in the ModCloth brand has been transitioned to Bicoastal (as defined herein) pursuant to a contribution agreement, dated October 4, 2023.

In December 2021, Native Brands and CFL Delaware, Inc. ("**CFL**") (an entity not affiliated with the Debtors) formed a joint venture, IPCO Holdings, LLC, a Delaware limited liability company ("**IPCO**"), whereby Native Brands contributed certain assets acquired from BTB (ABC), LLC ("**Betabrand**") and entered into a Master Services Agreement with IPCO to provide certain eCommerce services, marketing, photography, customer service and merchant credit card monitor fraud services. CFL entered into a related Master Supply Agreement with IPCO whereby it agreed to supply inventory to IPCO, provide manufacturing, fulfillment, logistics and warehousing services for the inventory. IPCO owns the BetaBrand brand, a women's clothing line known for dress yoga pants and other active wear for work and travel.

In October 2023, Native Brands formed a joint venture, Bicoastal Alliance LLC, a Delaware limited liability company ("**Bicoastal**"), with Gabe Zeitouni ("**Zeitouni**") (an individual not affiliated with the Debtors). Pursuant to a contribution agreement, dated October 4, 2023, Native Brands transferred to Bicoastal its interests in certain intellectual property owned by ModCloth (resulting in Bicoastal now owing the ModCloth brand). Zeitouni, in turn, contributed $700,000 to Bicoastal in exchange for a note. Bicoastal is subject to various agreements under which (i) CFL may ultimately transfer its ownership interests in IPCO to Zeitouni and (ii) Native Brands and Zeitouni may subsequently transfer IPCO's intellectual property to Bicoastal. There is also a put option agreement, under which Native Brands may acquire, or may be obligated to acquire, Zeitouni's ownership interest in Bicoastal, resulting in Native Brands owning 100 percent of the membership interests in the Bicoastal joint venture.

### B.    <u>Property and Business Operations</u>

### 1.    Real Property Interests

Historically, the Debtors' corporate headquarters was leased pursuant to that certain *Office Lease Agreement*, dated February 12, 2019 (the "**Tustin Lease**") with Flight Phase I Owner, LLC and located at 1775 Flight Way, Tustin, California. As part of their restructuring efforts, the Debtors determined that their corporate employees are capable of working remotely in a more cost-efficient manner and that the Tustin Lease would not be required for go-forward operations. Accordingly, and as discussed below, the Debtors have rejected the Tustin Lease as of the Petition Date.

The Debtors also lease two distribution centers, one in California and the other in Pennsylvania. The California distribution center, located in Fontana, California (the "**Fontana Facility**"), was leased pursuant to that certain *Standard Industrial/Commercial Single-Tenant Lease – Net*, dated September 9, 2019 (the "**Fontana Lease**") with the Robert K. Vogel Family Trust and was located at 10846 Commerce Way, Fontana, California. The premises leased thereunder was then subsequently subleased pursuant to that certain *Sublease for a Single Sublessee*, dated September 8, 2023 (the "**Fontana Sublease**" and, together with the Fontana Lease and the Tustin Lease, the "**Rejected Leases**") with JEDD3PL LLC. The rent owed by the Debtors under the Fontana Lease exceeds the amount of rent recent received by the Debtors under the Fontana Sublease. Accordingly, the Debtors lose money on the Fontana Sublease. Prior to the Petition Date, the Debtors determined that, in connection with the Chapter 11 Cases and their operational strategy moving forward, they would no longer have a business need for the Fontana Facility. As such, contemporaneously with the filing of the Chapter 11 Cases, the Debtors filed a motion seeking authority to reject the Rejected Leases effective *nunc pro tunc* to the Petition Date [Docket No. 16]. On December 28, 2023, the Bankruptcy Court entered an order rejecting the Rejected Leases effective as of the Petition Date [Docket No. 113].

The Pennsylvania distribution center, located in Pittsburgh, Pennsylvania (the "**Pittsburgh Facility**"), is leased pursuant to that certain *Lease*, dated September 9, 2021 with HM 2250 Roswell, L.P. and located at 2250 Roswell Drive, Pittsburgh, Pennsylvania. In connection with their Chapter 11 strategy, the Debtors are evaluating whether there remains a business need for the Pittsburgh Facility.

### 2.    Business Operations

The Debtors operate a CaaS platform that delivers an integrated set of technologies providing their clients with enterprise-level capabilities, enabling them to compete in a highly competitive digital commerce environment dominated by a handful of large, well-resourced retailers and marketplaces. As clients grow their brand, they often require additional capabilities beyond those provided by consumer grade online storefronts and generally available applications. The Debtors provide the technology for these growing brands to manage complexities relating to experience personalization, customer segmentation, product/catalog management, promotional offers, and other related features. The CaaS platform's tools provide clients with capabilities around website development, digital photography and video content management, customer service, acquisition and retention marketing, warehousing, and fulfillment. The Debtors' business model has historically been based on providing a turnkey e-commerce software solution to its partners on a revenue-sharing basis. As the Debtors' technology has continued to evolve, they have increasingly provided services on a more modular basis, allowing the Debtors' comprehensive capabilities to be configured in a fit-for-purpose manner for prospects and customers. The Debtors' platform is used by online businesses whose needs are too complex for consumer grade SaaS e-commerce platforms, yet require more flexibility and economic viability than provided by enterprise solutions.

The CaaS platform includes all proprietary technologies developed by the Debtors, as well as integrations with leading third-party applications, and incorporates ongoing research and development ("**R&D**") implemented within both a client's storefront as well as technologies developed for other clients that may have applicability, effectively absorbing all e-commerce related R&D costs for the Debtors' customers. The Debtors offer a single point of contact account leader, enabling either significant cost savings or unlimited scalability, demonstrated increases in sales or conversion rate performance, and various other benefits. Indeed, utilizing data generated over the past 13 years, the Debtors have developed buyer behavior models that leverage millions of transactions. The Debtors' software utilizes this data to leverage machine learning algorithms around discounts and mark downs, shipping offers, traffic acquisition, media responsiveness, and customer service that their brands can leverage, driving return on investment both on and off the website platform. By testing, tracking and tagging, the Debtors' software can determine the impact of implementing new strategies for their clients. This practice is often referred to as A/B testing and

involves the quantitatively robust study of user behavior. This allows clients to gain insight into what is impacting margins and uncover areas of focus to improve upon.

The Debtors' platform helps brands develop relationships directly with their customers leading to accelerated revenue growth, improved customer engagement, and reduced costs related to re-platforming and third-party integrations. The Debtors optimize the entire e-commerce lifestyle for B2C brands, such as bebe, Scotch & Soda, Hurley, and Kenneth Cole, often achieving growth and improvements in profitability during the first year.

The Debtors' primary source of revenue is through revenue share driven fees derived from transactions processed through the Debtors' e-commerce platform. Consideration for online sales is collected directly from the end consumer by the Debtors and amounts not payable to the Debtors are then remitted to their customer. Under this arrangement, the Debtors earn defined amounts based on the individual contract terms. Certain inventory sold by the Debtors was provided to the Debtors in accordance with consignment agreements. The Debtors also recognize additional revenue through, among other things, the provision of fulfillment services, marketing and program management related services, shipping services, photography and creative services, and customer service.

The Debtors' revenues were $101.3 million and $94.5 million in the years ended December 31, 2021 and 2022, respectively. The Debtors experienced net operating losses of approximately $2.3 million, $0.1 million, and $52.7 million for the years ended December 31, 2020, 2021 and 2022, respectively. Year to date net operating losses as of September 2023 were approximately $36 million.

        3.      Bluestar Alliance

The Debtors' relationship with Bluestar Alliance, a brand management company holding companies with ownership interests in brands such as bebe, Scotch & Soda, Hurley, Brookstone and Justice, is a key component of, and significant source of, the Debtors' revenues. Indeed, the RSA specifically contemplates that the Debtors will use reasonable best efforts to obtain an extension of certain agreements with Bluestar Alliance brands (the "**Bluestar Contracts**"). As such, the Debtors understand that, as of the date hereof, it is the Plan Sponsor's intention to acquire the Bluestar Contacts through the Debtors' assumption and assignment of such contracts in connection with the Sale Transaction.

**III.**
**DEBTORS' CORPORATE AND CAPITAL STRUCTURE**

    **A.**      **Corporate Structure**

Nogin, a Delaware corporation, is the ultimate parent of each of the other Debtors. Nogin's common stock is traded publicly on the Nasdaq Global Market. Debtor Nogin Commerce, Inc., a Delaware corporation ("**Nogin Commerce**"), is a wholly-owned subsidiary of Nogin. Nogin Commerce, in turn, owns 100 percent of the membership interests in Native Brands, a California limited liability company, which was formed for purposes of acquiring ownership interests in distressed retail brands. Native Brands holds ownership interests in various joint ventures, which are not debtors in these Chapter 11 Cases. A detailed organizational chart depicting the ownership structure of the Debtors is attached hereto as **Exhibit B**.

13

B.    **Corporate Governance and Management**

    1.    Nogin, Inc.

As of the Petition Date, the Nogin Board consists of the following six (6) members, including four (4) independent directors:

| Name | Director Since | Position/Affiliation |
| --- | --- | --- |
| Jonathan S. Huberman | August 2022 | Chief Executive Officer, President and Chairman of the Board |
| Shahriyar Rahmati | June 2023 | Chief Financial Officer and Chief Operating Officer |
| Andrew Pancer | February 2023 | Independent Director |
| Arthur Stark | June 2023 | Independent Director |
| Wilhelmina Fader | August 2022 | Independent Director |
| Eileen Moore Johnson | August 2022 | Independent Director |

As discussed above and herein, prior to the Petition Date, the Nogin Board formed the Strategic Transactions Committee comprised of three independent directors – Wilhelmina Fader, Eileen Moore Johnson, and Andrew Pancer – to, among other things, direct and oversee all aspects of Nogin's restructuring process and the Chapter 11 Cases.

    2.    Nogin Commerce, Inc.

As of the Petition Date, Nogin Commerce's board (the "**Nogin Commerce Board**") consists of the following six (6) members, including four (4) independent directors:

| Name | Director Since | Position/Affiliation |
| --- | --- | --- |
| Jonathan S. Huberman | August 2022 | Chief Executive Officer, President and Chairman of the Board |
| Shahriyar Rahmati | June 2023 | Chief Financial Officer and Chief Operating Officer |
| Andrew Pancer | February 2023 | Independent Director |
| Arthur Stark | June 2023 | Independent Director |
| Wilhelmina Fader | August 2022 | Independent Director |
| Eileen Moore Johnson | August 2022 | Independent Director |

Prior to the Petition Date, the Nogin Commerce Board formed the Strategic Transaction Committee comprised of three independent directors – Wilhelmina Fader, Eileen Moore Johnson, and Andrew Pancer – to, among other things, direct and oversee all aspects of Nogin Commerce's restructuring process.

    3.    Native Brands Group LLC

As of the Petition Date, Nogin Commerce is the sole member (the "**Sole Member**") of Native Brands. Native Brands, as a manager-managed LLC, is managed by two managers – Jonathan S. Huberman and Shahriyar Rahmati.  The Sole Member, and as a result the Strategic Transaction Committee, maintains consent rights regarding material transactions under Native Brands organizational documents.

### C.    Prepetition Capital Structure

     *i.*     Prepetition Indebtedness

As of the Petition Date, the Debtors had secured obligations of approximately $78.4 million outstanding in an aggregate principal amount (exclusive of interest) pursuant to: (a) the Senior Notes; (b) a Prepetition Bridge Loan (as defined below); and (c) the 2023 Loans (as defined below) (collectively, the "**Secured Obligations**").[2] Further, as of the Petition Date, the Debtors had unsecured obligations of approximately $48.2 million in outstanding trade payables, amounts due to clients and other unsecured debt (the "**Unsecured Obligations**," and together with the Secured Obligations, the "**Debt Obligations**"). The Debt Obligations are described in detail below:

| Instrument / Facility | Maturity Date | Principal Outstanding (million) |
|---|---|---|
| Senior Notes | September 1, 2026 | $65.5 |
| Prepetition Bridge Loan | N/A | $8.53 |
| 2023 Loans | Various | $4.39 |
| Trade Payables and Other Unsecured Debt | Various | $48.2[3] |
| **Total** | | **$126.62** |

     *ii.*     Senior Notes and Indenture

On August 26, 2022, immediately prior to the closing of the Business Combination, Nogin issued $65.5 million aggregate principal amount of Senior Notes and, as contemplated by the PIPE Subscription Agreements, Nogin, as issuer, Nogin Commerce (known at the time as Branded Online, Inc.) and Native Brands, in their capacity as guarantors (the "**Note Guarantors**"), and U.S. Bank Trust Company, N.A., as trustee (the "**Indenture Trustee**"), entered into an Indenture governing the Senior Notes (the "**Indenture**"). The Senior Notes mature on September 1, 2026, unless earlier repurchased, redeemed or converted in accordance with their terms, and accrue interest at a rate of 7.00% per annum.  The Senior Notes are secured by duly perfected, first-lien security interests (the "**Indenture Liens**") in substantially all of the assets of Nogin and the Note Guarantors.

The Debtors did not timely make the payment of accrued interest on the Senior Notes due on March 1, 2023 as required by Section 2.05 of the Indenture, resulting in a default.  On March 26, 2023, Nogin, the Note Guarantors and holders of the Senior Notes entered into limited waivers and consents pursuant to which each holder agreed to (i) waive the default and any payment obligation of the Debtors under the Indenture with respect to the March interest payment, (ii) in lieu of the March interest payment and payment of the

---

[2] The Debtors believe that the 2023 Loans were never properly perfected and thus may be rendered unsecured by section 544(a) of the Bankruptcy Code.  The 2023 Loans while purported to be secured are included in the definition of Secured Obligations for the purpose of simplicity.  In addition, the alleged collateral for the 2023 Loans was previously pledged to the Holders of the Senior Notes (who hold a senior, prior, perfected lien).  Thus, even if the 2023 Loans were secured, they would be junior to the Senior Note Claims.  The Debtors fully reserve their rights with respect to the 2023 Loans, including the right to classify such claims as unsecured claims and the right to dispute/objection to the allowance of such claims.

[3] As of the date of the filing of this Disclosure Statement, as the result of further review, the payment of certain prepetition claims pursuant to various Bankruptcy Court orders and the rejection of certain leases discussed herein, the amount of trade payables and other unsecured debt is approximately $35,000,000.

15

accrued interest on the Senior Notes due on September 1, 2023 (the "**Interest Payments**"), receive a promissory note and reduce the exercise price of applicable warrants, and (iii) consent to the entry of a supplemental indenture (the "**Supplemental Indenture**"). The Supplemental Indenture, among other things, lowered minimum liquidity requirements, added restrictions on the Debtors' ability to make payments relating to certain restricted investments and removed the Debtors' ability to incur certain unsecured indebtedness or junior lien indebtedness.

On March 26, 2023, Nogin, the Note Guarantors and each holder of Senior Notes executed unsecured promissory notes (each a "**2023 Promissory Note**" and collectively, the "**2023 Promissory Notes**"), with each 2023 Promissory Note having an aggregate principal amount equal to such holder's Interest Payments. The 2023 Promissory Notes were set to mature on March 26, 2025, and accrued interest at 7% per annum. In addition, certain of the 2023 Promissory Notes provided such holders with the right to convert their respective promissory note (the "**2023 Convertible Promissory Notes**") into unregistered securities. In April 2023, all holders of the 2023 Promissory Notes exercised their put options and converted their notes into unregistered securities. As of September 20, 2023, the 2023 Promissory Notes and 2023 Convertible Promissory Notes were repaid in full.

      *iii.*      The Prepetition Bridge Loan

On November 16, 2023, Nogin entered into a promissory note (the "**Bridge Note**") with BR Securities, in its capacity as agent and lender (the "**Bridge Loan Agent**"), pursuant to which Nogin borrowed $8.53 million (the "**Prepetition Bridge Loan**") at an interest rate of 15% per annum and payable quarterly. The Bridge Note contains covenants that must be performed by Nogin including those that are contained in the Indenture with respect to (i) reporting requirements under the Securities Exchange Act; (ii) compliance and default certificates; (iii) restricted payments; (iv) collateral; (v) incurrence of indebtedness and issuance of preferred stock; and (vi) additional guarantees. Nogin Commerce and Native Brands are each guarantors under the Prepetition Bridge Loan. Pursuant to that certain Security Agreement, dated as of November 16, 2023 (the "**Bridge Loan Security Agreement**"), the borrowings under the Bridge Note are secured by liens on substantially all of the Debtors' assets that are junior to the Indenture Liens. Consistent with the terms of the RSA and the Bridge Loan Security Agreement, the Prepetition Bridge Loan was rolled-up in its entirety into the DIP Facility (as defined herein) upon the entry of the interim order approving the same in the Chapter 11 Cases on December 7, 2023 [Docket No. 59].

      *iv.*      The 2023 Loans

The Debtors also have outstanding obligations with respect to each of the following loans (collectively, the "**2023 Loans**"):

- On August 23, 2023, the Debtors obtained a loan of $320,000 with a merchant third-party with an annual interest rate of 9.77%, which is to be repaid from future cash receipts directly from the merchant. As of September 30, 2023, the outstanding balance of the loan was $325,000.

- On September 25, 2023, the Debtors obtained a loan of $500,000 from this same merchant third-party with a finance charge of $40,000. The loan is to be repaid on a daily basis based on a set percentage of the gross dollar value of sales.

- In July 2023, the Debtors refinanced an existing loan obtained in February 2023 to $2 million with the third-party with an annual interest rate of 34% and debt issuance cost of $25,000, which is to

be paid from future cash receipts.  As of September 30, 2023, the outstanding balance of the loan was $1.6 million.

- In August 2023, the Debtors obtained a loan for $2 million with the same third-party with an annual interest rate of 39% and debt issuance cost of $50,000, which is to be paid from future cash receipts. As of September 30, 2023, the outstanding balance of the loan was $1.7 million.

- In September 2023, the Debtors obtained two loans for a total of $1.5 million with two third-party loan originators with an annual interest rate of 42% and debt issuance cost of $73,000, which are to be paid from future receipts.  As of September 30, 2023, the outstanding balance of the loans was $1.5 million.

- In September 2023, the Debtors obtained a $500,000 loan with a merchant third-party with an annual percentage rate of 26.55%, which is to be repaid from future cash receipts directly from the merchant.  As of September 30, 2023, the outstanding balance of the loan was $495,000.

Per the terms of the underlying documents, each of the 2023 Loans purport to be secured by certain accounts receivable.  The Debtors believe, however, that all of the underlying loan parties have failed to properly perfect their interests in such receivables and, thus, the 2023 Loans may be rendered unsecured by section 544(a) of the Bankruptcy Code.  In addition, the alleged collateral for the 2023 Loans was previously pledged to the Holders of the Senior Notes (who hold a senior, prior, perfected lien).  Thus, even if the 2023 Loans were secured, they would be junior to the Senior Note Claims.

   *v.*   Unsecured Trade Debt

As of the Petition Date, the Debtors estimate that they have approximately $48.2 million in outstanding trade or client payables and other unsecured debt.

   *vi.*   Common Stock

Subsequent to the Business Combination, Nogin is authorized to issue up to 500 million shares of common stock.  As of the Petition Date, Nogin had approximately 11,288,523 shares of common stock issued and outstanding.[4]

## IV.
## SIGNIFICANT EVENTS LEADING TO THE CHAPTER 11 FILING

### A. Need for Additional Capital to Support Growth

The Debtors experienced significant bookings (defined as forward twelve-month revenue expectations) growth over recent periods based, in part, on their ability to (i) attract new customers and retain and increase sales to existing customers, (ii) maintain and expand relationships with customers, (iii) develop their existing CaaS platform and introduce functionality to the CaaS platform; and (iv) expand into new market segments and internationally.  Despite the Debtors' recent commercial successes, the Debtors have been experiencing a continued liquidity drain driven by activities that involved past agreements requiring them to purchase and sell inventory on a first party basis.  These activities were dominantly comprised of three clients: the Justice brand, the Betabrand brand and the ModCloth brand. The losses generated by these client arrangements resulted in the Company holding large amounts of inventory on their balance sheet that was

---

[4] Nogin is also authorized to issue 50 million shares of preferred stock.  There were no shares of preferred stock issued and outstanding as of the Petition Date.

significantly aged or delivered out of prime selling season(s). The Debtors sought to enter into a consignment or quasi-consignment arrangement with the primary licensee of Justice brand products but were unable to do so until recently. Losses driven by the Justice brand significantly impacted the Debtors' ability to invest in the Betabrand and ModCloth brands. The accumulated shortfall in the Debtors' liquidity then made it challenging to remain current with key vendors, and ultimately, several of their customers. The combination of new customer growth, underperformance in the aforementioned brands and historical liabilities from 2021 and 2022 placed significant demands upon the Debtors' management team, and their operational and financial resources. The Debtors have funded their operations since their inception primarily through equity financing, debt, and payments by customers for use of their CaaS platform and related services.

In addition, the market for e-commerce solutions is evolving and highly competitive. Indeed, competition from established competitors and new market entrants has increased and is expected to continue in the future with the introduction of new technologies and market participants. The Debtors face intense competition from other software companies that may offer related e-commerce platform software solutions and services, as well as from larger companies that have acquired e-commerce platform solution providers in recent years. The Debtors also face competition from niche companies that offer single-purpose technology solutions that attempt to address or replicate certain capabilities built into the CaaS platform. Accordingly, in order to effectively compete and grow their business, the Debtors must continue making investments in developing their technology and protecting market share. Moreover, the Debtors have incurred significant additional legal, accounting, and other expenses related to Nogin being a public company.

While the Debtors are primed to achieve their near- and long-term revenue projections, they require additional capital to get there. Management has contracted close to $70 million in revenue for the 2024 fiscal year, recently acquired new brands across diverse end-markets and identified multiple additional customers to pursue. The Debtors are well positioned to increase gross margins in the foreseeable future given the increasing mix of CaaS business and have plans to exit certain margin dilutive business lines.

### B.  Prepetition Marketing Effort

Given their ongoing need for additional capital, on August 28, 2023, the Debtors retained BR Securities as non-exclusive financial advisor to (i) assist the Debtors in exploring additional sources of capital, including through a potential sale of equity, to support a prospective business combination with another entity in the e-commerce space; and (ii) negotiate a potential recapitalization or restructuring of the Senior Notes in connection with such transaction. In the end, the potential business combination did not come to fruition and, as a result, there was no restructuring or recapitalization to discuss with the holders of the Senior Notes at that time.

On September 27, 2023, the Debtors separately retained Houlihan Lokey Capital, Inc. ("**Houlihan Lokey**") to provide financial advisory and investment banking services to the Debtors in pursuing a potential sale of all or a significant portion of the Debtors' assets or capital stock. The Debtors viewed the services of BR Securities and Houlihan Lokey as complementary of each other. BR Securities' efforts were focused on a business combination and related equity raise with regards to a specific e-commerce partner, whereas Houlihan Lokey would cast a much broader net in identifying strategic and financial buyers in pursuit of a potential merger, acquisition or other form of business combination. Beginning on October 16, 2023, Houlihan Lokey began reaching out to prospective parties to evaluate a potential go-private transaction. Houlihan Lokey's outreach targeted 57 different parties - approximately 65% of which were investment funds of various types, with the remaining 35% comprised of potential strategic investors. Twenty of the parties approached executed non-disclosure agreements and received confidential information packages (CIPs).

In the absence of an immediate solution to their pressing liquidity needs, the Debtors began considering the prospect of pursuing a sale process under chapter 11 of the Bankruptcy Code. Accordingly, on October 20, 2023, the Debtors' management contacted BR Investments to gauge its interest in providing debtor-in-possession financing and pursuing a transaction under chapter 11 of the Bankruptcy Code. At or around this same time, after being notified by the Debtors that their need for additional liquidity had become more urgent, Houlihan Lokey's efforts became more focused on identifying parties that could move quickly and/or provide an interim solution to address the Debtors' immediate need for capital.

Following a series of discussions between the parties, on November 2, 2023, the Debtors received the BRI Term Sheet from BR Investments, an affiliate of BR Securities,[5] proposing a transaction whereby BR Investments would acquire a majority of the Debtors' equity interests through a chapter 11 process. The Debtors then immediately began to focus their efforts on BR Investments given its ability to provide near-term capital in conjunction with a potential acquisition of the Debtors. While the Debtors continued their outreach to other prospective investors and business partners, BR Investments was the only party that expressed an interest in pursuing a restructuring transaction that would address the Debtors' near- and long-term liquidity needs. Accordingly, the Debtors, BR Investments and the Ad Hoc Committee of Noteholders began a series of intensive arm's length negotiations that ultimately led to the execution of the RSA.

### C.    Formation of the Strategic Transactions Committee

As noted above, in connection with reviewing, evaluating and negotiating strategic alternatives, including a potential transaction with BR Investments, both the Nogin Board and the Nogin Commerce Board determined that it was appropriate and advisable to establish the Strategic Transactions Committee consisting solely of independent directors and to delegate to the Strategic Transactions Committee the power to, among other things, consider, review, evaluate and determine whether to approve any proposed transactions submitted to the Company, the Nogin Board, or the Nogin Commerce Board or any alternatives thereto. On November 15, 2023, at a special meeting of the Nogin Board, the Nogin Board unanimously approved the creation of, and delegation of authority to, the Strategic Transactions Committee. On November 16, 2023, acting by unanimous written consent, the Nogin Commerce Board appointed Wilhelmina Fader, Eileen Moore Johnson, and Andrew Pancer to the Strategic Transactions Committee at Nogin Commerce.

### D.    The Restructuring Support Agreement

On November 16, 2023, the Debtors, the Bridge Loan Agent, the Plan Sponsor and holders of approximately 90% of the Senior Notes (the "**Consenting Noteholders**", and collectively with the Debtors, the Bridge Loan Agent and the Plan Sponsor, the "**RSA Parties**") entered into the RSA. The RSA provides for the implementation of a series of restructuring transactions (the "**Restructuring Transactions**") pursuant to which, *inter alia*, (i) the Debtors shall commence these Chapter 11 Cases on or before December 1, 2023[6]; (ii) the Plan Sponsor or an affiliate thereof shall provide a debtor-in-possession financing facility (the "**DIP Facility**"), which shall be used to fund the Chapter 11 Cases and will be secured by liens and

---

[5]  BR Investments and BR Securities are both wholly owned subsidiaries of B. Riley Financial, Inc., a publicly traded, diversified financial services firm. On November 1, 2023, and in light of the BRI Term Sheet, the Debtors and BR Securities entered into a withdrawal and waiver letter with respect to BR Securities' financial advisory engagement whereby (i) the parties agreed to BR Securities' withdrawal from its representation of the Debtors (given the potential conflicts of interest or appearance thereof); (ii) the Debtors waived all actual or potential conflicts of interest or similar claims against BR Securities or BR Investments; and (iii) BR Securities confirmed that consummation of a transaction with BR Investments would not trigger the payment of certain fees contemplated under the engagement letter between the Debtors and BR Securities.

[6]  This deadline was subsequently extended with the consent of the Plan Sponsor to December 4, 2023.

security interests that would prime the Indenture Liens; (iii) subject to Court approval, the Bridge Loan shall be rolled-up into the DIP Facility upon entry of an interim order approving the DIP Facility; and (iv) under the terms of a chapter 11 plan, (a) the DIP Facility shall be equitized into 100% ownership of the "Reorganized Debtors" or to acquire substantially all of the Debtors' assets; (b) the Senior Noteholders shall receive their *pro rata* share of $15.5 million[7], funded from either the Debtors' available cash or by the Plan Sponsor, together with beneficial interests in the Creditor Litigation Trust which shall be vested with the Retained Causes of Action against certain Insiders and Affiliates of the Debtors; and (c) the Plan Sponsor, the Consenting Noteholders, and certain related and additional parties shall receive releases of all estate causes of action.[8]    The RSA Parties have agreed that the proposed transaction shall be subject to higher and better offers through a Court-approved auction process, with the Debtors' having a "fiduciary out" allowing them to pursue alternative transactions that would be consistent with their fiduciary obligation to maximize value for the benefit of their stakeholders.  While the Debtors' prepetition efforts did not yield any additional binding offers, the Debtors are seeking to retain Livingstone to serve as investment banker to the Debtors in overseeing a postpetition marketing process intended to serve as a market-check on the Plan.

Section 4 of the RSA contains the following milestones ("**Milestones**") relating to implementation of the Restructuring Transactions (the Milestones are repeated in the *Senior Secured Super-Priority Debtor-In-Possession Loan and Security Agreement* (the "**DIP Credit Agreement**")). [9]

| | |
|---|---|
| **Entry of Interim DIP Order** | Within 3 days of Petition Date |
| **Filing of Plan and Disclosure Statement** | December 18, 2023 |
| **Entry of Bid Procedures Order** | No later than January 11, 2024 |
| **Entry of Final DIP Order** | No later than January 31, 2024 |
| **Entry of Order Approving Disclosure Statement** | No later than January 22, 2024 |
| **Commencement of Confirmation Hearing** | No later than March 1, 2024 |
| **Plan Effective Date** | No later than March 14, 2024 |

In accordance with the RSA, on December 18, 2023, the Debtors filed a prearranged plan [Docket No. 83] (the "**Plan**"), consistent with the Milestones (as extended from time to time, in accordance with the RSA). In addition, on December 18, 2023, the Debtors filed that certain *Motion of Debtors for Entry of (I) an Order (A) Establishing Bidding Procedures for the Solicitation of Alternative Transactions to the Proposed Chapter 11 Plan, (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and (F) Approving the Form and Manner of Notice Thereof and (G) Granting Related Relief; and (II) If Necessary, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 82] (the "**Bidding Procedures Motion**") seeking to establish a Court-approved auction process under which the Plan shall serve as the "Stalking Horse Bid." On January 11, 2024, the Bankruptcy Court entered an order approving the relief requested in the Bidding

---

[7]  The RSA provided for "Cash Settlement Consideration" to the Senior Noteholders in the amount of $15 million. This amount was subsequently increased to $15.5 million based on subsequent negotiations between the Plan Sponsor and the Consenting Noteholders.

[8]  On November 16, 2023, prior to the Debtors' execution of such documents, the Strategic Transactions Committee considered and approved the Debtors entry into the RSA and the Prepetition Bridge Loan.

[9]  Pursuant to section 4.02 of the RSA, counsel to the Plan Sponsor has agreed to extensions of the Milestones set forth in the RSA.  The chart set forth herein contains the revised Milestones as agreed to by the Debtors and the Plan Sponsor.

Procedures Motion [Docket No. 162] (the "**Bidding Procedures Order**"). The Bidding Procedures Order, among other things, establishes certain key dates and deadlines, including the following:

| | |
|---|---|
| **January 18, 2024** | Deadline for Debtors to file and serve Sale Notice and Assumption and Assignment Notice |
| **February 1, 2024, at 4:00 p.m. (ET)** | Sale Objection Deadline and Cure Objection Deadline |
| **February 16, 2024, at 4:00 p.m. (ET)** | Bid Deadline |
| **February 20, 2024, at 10:00 a.m. (ET), at the office of Richards, Layton & Finger, P.A., located at One Rodney Square, 920 North King Street, Wilmington, Delaware 19801** | Auction |
| **One day after the conclusion of the Auction** | Deadline for Debtors to file and serve Notice of Auction Results |
| **February 23, 2024, at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **February 27, 2024, at 12:00 Noon (ET)** | Debtors' Deadline to Reply to Supplemental Objections |
| **February 29, 2024, at 10:00 a.m. (ET)** | Sale Hearing/Confirmation Hearing |
| **March 13, 2024** | Deadline to consummate approved Asset Sale Transaction and effective date of the Plan |

As discussed below, with the assistance of Livingstone, the Debtors will be soliciting bids for alternative transactions that can be structured as either a sale of substantially all of the Debtors' assets (an "**Asset Sale Transaction**") or an acquisition of the Reorganized Equity Interests. The auction process will serve as a market-check of the Plan and ensure that the Debtors are pursuing a transaction that provides the maximum benefit to, and is in the best interests of, their estates.

21

# V.
# OVERVIEW OF CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

   i.    First Day Motions

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations, relationships with the vendors, revenue and profits, on the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). The Bankruptcy Court granted all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Jointly administer the Chapter 11 Cases [Docket No. 43];

- Establish procedures for utility providers to request adequate assurance of payment and to resolve objections by the utility providers, and to prohibit utility providers from altering, refusing or discontinuing service on a final basis [Docket No. 143];

- Employ special electronic noticing procedures on a final basis [Docket No. 147];

- Continue and maintain certain customer programs and honor prepetition obligations related thereto on a final basis [Docket No. 153];

- Continue and renew various insurance programs and premium financing on a final basis [Docket No. 144];

- Pay certain prepetition claims of critical vendors and shippers on a final basis [Docket No. 154];

- Pay certain prepetition taxes and fees on a final basis [Docket No. 145];

- Pay certain prepetition customer remittance claims and perform under certain master service agreements on a final basis [Docket No. 156];

- Continue the use of the Debtors' cash management system, bank accounts and business forms, intercompany transfers on a final basis [Docket No. 158];

- Pay certain prepetition wages, salaries, compensation, reimbursable expenses on account of the Debtors' compensation benefits programs and continue the compensation benefits programs on a final basis [Docket No. 146];

- Continue the use of cash collateral and authorizing the Debtors to obtain postposition financing on a superpriority basis on an interim basis [Docket Nos. 59 & 185].

   ii.    Second Day Orders

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain orders, approving, among other things, (i) procedures authorizing interim compensation of professionals [Docket No. 148], (ii) procedures to retain and compensate professionals utilized in the ordinary course of business [Docket No. 157], (iii) the extension of time for the Debtors to file their

22

Schedules and Statements (as defined below) [Docket No. 168] and (iv) the rejection of the Rejected Leases *nunc pro tunc* to the Petition Date [Docket No. 113].

> iii.    Retention of Chapter 11 Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the following advisors: (i) Richards, Layton & Finger, P.A, as counsel to the Debtors [Docket No. 141]; (ii) Livingstone, as investment banker to the Debtors [Docket No. 159]; (iii) Triple P RTS, LLC to provide Mr. Vladimir Kasparov and Ms. Robin Chiu, as Chief Restructuring Officer (the "**CRO**") and Deputy Chief Restructuring Officer (the "**DCRO**"), respectively, and to provide certain other personnel and interim management services to the Debtors [Docket No. 161]; and (iv) DRC, as the Voting and Claims Agent and Administrative Advisor, respectively [Docket Nos. 49 and 139].

> iv.    Appointment of a Chief Restructuring Officer.

On December 4, 2023, the Board appointed Mr. Kasparov and Ms. Chiu as the CRO and DCRO, respectively. Mr. Kasparov and Ms. Chiu, as independent and experienced restructuring advisors, are responsible for matters, and hold acting authority, customary for a chief restructuring officer of a company of the Debtors' size in bankruptcy.

> **B.    Appointment of Creditors' Committee**

On December 18, 2023, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") pursuant to section 1102(a)(1) of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Case [Docket No. 81]. The members of the Creditors' Committee are Justice Brand Holdings, LLC, Thread Collective, Inc., and Cordial Experience, Inc. The Creditors' Committee engaged Lowenstein Sandler LLP and Morris James LLP, as its attorneys [Docket No. 99].

> **C.    Statements and Schedules and Claims Bar Date**

> i.    Schedules and Statements

On December 21, 2023, the Debtors filed a motion [Docket No. 96] seeking to extend the deadline by which they may file their schedules of assets and liabilities, schedules of executory contracts, and statements of financial affairs (collectively, the "**Schedules and Statements**") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.  On January 16, 2024, the Bankruptcy Court entered an order extending the Debtors' deadline to file their Schedules and Statements through and including January 22, 2024. The Debtors believe that the Schedules and Statements will be filed in advance of the Confirmation Hearing (as defined herein).

> ii.    Claims Bar Date

On January 8, 2024, the Debtors filed the *Motion of Debtors for Entry of Order Establishing Deadline for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 122] (the "**Bar Date Motion**") seeking authority to establish certain deadlines for filing proofs of claims in the Chapter 11 Cases including: (i)  the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii)  the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**");

(iii) establishing the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days from the date on which the Debtors provide notice of a previously unfiled Schedule or an amendment or supplement to the Schedule, as the deadline by which persons or entities affected by such filing, amendment, or supplement must file proofs of claim in the Chapter 11 Cases; and (iv) establishing the later of (x) the General Bar Date or the Governmental Bar Date, as applicable, and (y) 5:00 p.m., prevailing Eastern Time, on the date that is thirty (30) days following the service of an order approving rejection of any executory contract or unexpired lease of the Debtors as the deadline by which persons or entities asserting claims resulting from such rejection must file proofs of claim in the Chapter 11 Cases. On January 22, 2024, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion [Docket No. 199] (the "**Claims Bar Date Order**").

## D.     Bidding Procedures

The RSA Parties have agreed that the Restructuring Transactions must be subject to higher and better offers through a Court-approved auction process, with the Debtors having a "fiduciary out" allowing them to pursue alternative transactions consistent with their fiduciary obligation to maximize value for the benefit of all stakeholders. The Plan will serve as the Stalking Horse Bid (with the Plan Sponsor being deemed the Stalking Horse Bidder against which interested parties can submit competing bids). The Debtors' overriding goal is to maximize the net benefit received by their estates and therefore available to the Debtors' stakeholders. Accordingly, bids may be structured as either a sale of substantially all of the Debtors' Assets or an acquisition of the Reorganized Equity Interests in the Reorganized Debtors.

As described above, the Debtors agreed to the case timeline set forth in the RSA, which set out certain milestones that the Debtors are required to comply with in relation to the post-petition sales and marketing process to solicit higher and better bids. To that end, the Debtors filed the Bidding Procedures Motion, seeking approval of procedures to govern the solicitation of competing bids (the "**Bidding Procedures**"). Through the Bidding Procedures, the Debtors intend to promote a competitive and expedient bidding and sale process designed to generate the greatest level of interest in and the best value for the Debtors' Assets and Reorganized Equity Interests while affording the Debtors maximum flexibility to execute a sale or pivot to other strategic alternatives as quickly and efficiently as possible. On January 11, 2024, the Bankruptcy Court entered the Bidding Procedures Order.

The Debtors' marketing process is being led by Livingstone, who has solicited interest from an expansive and diverse universe of potential strategic and financial parties. On December 13, 2023, Livingstone commenced its outreach to potential bidders. To date, Livingstone has contacted a substantial number of potential strategic and financial buyers, and numerous parties have executed non-disclosure agreements. All buyers that have executed non-disclosure agreements have been provided with a comprehensive information presentation and access to a virtual data room. The virtual data room contains an extensive amount of unique due diligence materials to assist potential bidders in their evaluation of the acquisition opportunity. In addition, Livingstone has conducted due diligence discussions with potential bidders, offered to facilitate diligence discussions between potential bidders and the Debtors, and invited parties to submit additional information requests to further their due diligence efforts. Livingstone has, and will continue to facilitate all aspects of bidder due diligence and other process-related documentation. As discussed above, if any bidders submit a Qualified Bid, the Debtors will hold an Auction to determine if any bids provide greater value to their estates than the Plan Sponsor's Stalking Horse Bid.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.

### A.    Administrative and Priority Claims

#### i.    Administrative Claims

Except with respect to Professional Fee Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash, or otherwise receive treatment consistent with the provisions of the Bankruptcy Code (i) on the Effective Date, if such Administrative Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); or (ii) if such Administrative Claim is not Allowed as of the Effective Date, then within thirty (30) calendar days after the date such Administrative Claim is Allowed; *provided, that,* if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Requests for payment of Administrative Claims must be filed and served on (i) the Debtor Liquidating Trustee or the Post-Effective Date Debtor(s), as applicable, and (ii) Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; *provided that* the Administrative Claims Bar Date does not apply to Administrative Claims arising in the ordinary course of business as conducted prior to the Petition Date.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, THE POST-EFFECTIVE DATE DEBTOR(S), THE BUYER, THE CREDITOR LITIGATION TRUST, THE CREDITOR LITIGATION TRUSTEE, THE DEBTOR LIQUIDATING TRUST, THE DEBTOR LIQUIDATING TRUSTEE OR THE ASSETS OR PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DISCHARGED AS OF THE EFFECTIVE DATE.**

#### ii.    Professional Fee Claims

##### (a)    Final Fee Applications

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) calendar days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Objections to any Professional Fee Claim must be filed and served on counsel to the Debtors, the U.S. Trustee, and the Holder of such Professional Fee Claim no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtors and the party requesting compensation of a Professional Fee Claim).

       *(b)*      <u>Professional Fee Account</u>

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Account with Cash equal to the Professional Fee Claims Estimate prior to making any Distributions under the Plan.  No Liens, Claims, or Interests shall encumber the Professional Fee Account in any way, and such account shall not be subject to the control of any party other than the Professional Fee Escrow Agent.  The Professional Fee Account (including funds held in the Professional Fee Account) (i) shall not be and shall not be deemed property of the Debtors, the Estates, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, or the Debtor Liquidating Trust and (ii) shall be held in trust for, and exclusively available for, the payment of Professional Fees as they become Allowed and payable; *provided, that*, funds remaining in the Professional Fee Account after all Allowed Professional Fee Claims have been irrevocably paid in full, as acknowledged in writing by all applicable Professionals, shall promptly be transferred to the Plan Sponsor, without the need for any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  Allowed Professional Fee Claims shall be paid in Cash by the Professional Fee Escrow Agent to such Professionals from funds held in the Professional Fee Account when such Claims are Allowed by an order of the Bankruptcy Court; *provided, that*, Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Account and, to the extent any Allowed Professional Fee Claims remain unpaid after exhaustion of the Professional Fee Account, such remaining Allowed Professional Fee Claims shall be paid by the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable.

       *(c)*      <u>Professional Fee Claims Estimate</u>

No later than five (5) Business Days prior to the Effective Date, Holders of Professional Fee Claims shall provide a reasonable, good faith estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors on or before the Effective Date, including any fees and expenses projected to be outstanding as of the Effective Date, and the Debtors shall fund the  Professional Fee Account held by the Professional Fee Escrow Agent with such estimated amounts for the benefit of the Holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties; *provided, that*, such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of a Professional's final request for payment of filed Professional Fee Claims.  If a Holder of a Professional Fee Claim does not provide such an estimate, the Debtors may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such Holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, as acknowledged in writing by all applicable Professionals, any remaining amount in the Professional Fee Account shall promptly be transferred to the Plan Sponsor, without requiring any further action or order of the Bankruptcy Court.

       *(d)*      <u>Post-Effective Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Distribution Agent shall, in the ordinary course of business and without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan. Upon the Effective Date, any requirement that professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee or the Debtor Liquidating Trustee, as applicable, may employ any professional in the ordinary course of business without the need for any further notice to or action, order, or approval of the Bankruptcy Court.

### iii.        Priority Tax Claims

Except to the extent that a Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash, or otherwise receive treatment consistent with the provisions of the Bankruptcy Code (i) on the Effective Date, if such Priority Tax Claim is Allowed as of the Effective Date (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter) or (ii) if such Priority Tax Claim is not Allowed as of the Effective Date, within thirty (30) calendar days after the date such Priority Tax Claim is Allowed.

### iv.        DIP Claims

All DIP Claims (including, for the avoidance of doubt, the Bridge Loan Claims, as rolled-up under the DIP Orders) shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Loan on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) any and all accrued and unpaid fees, expenses and indemnification obligations or other obligations of any kind payable under the DIP Credit Agreement Documents.

To the extent the DIP Lender is the Successful Bidder, the DIP Claims shall be deemed to be fully and finally satisfied by the issuance of the Reorganized Equity Interests to the DIP Lender or an Affiliate thereof pursuant to the Equity Sale Transaction Documents and this Plan.  In the event that the DIP Lender is not the Successful Bidder, except to the extent that the DIP Lender, as the sole Holder of an Allowed DIP Claim, agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, the DIP Lender shall receive indefeasible payment in full in Cash of such Holder's Allowed DIP Claim on the Effective Date, which Allowed amount shall not be subject to setoff, defense, counterclaim, recharacterization or avoidance.

Upon the indefeasible payment or satisfaction in full in Cash, or other satisfactory treatment, of the DIP Claims (other than any DIP Claims based on the Debtors' contingent obligations under the DIP Credit Agreement for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be automatically terminated and of no further force and effect without any further notice to, or action, order, or approval of, the Court or any other Entity. Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, the Debtors' contingent or unliquidated obligations under the DIP Credit Agreement, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner reasonably acceptable to the DIP Lender, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary and, on and after the Effective Date, shall be satisfied by utilizing funds in the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable.

### v.        Indenture Trustee Fees and Expenses

On the later of the Effective Date or five (5) Business Days following the receipt of an invoice, the Distribution Agent shall pay in full in Cash any Indenture Trustee Fees and Expenses without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.  Such payments shall constitute a Distribution on account of the Allowed Senior Notes Claim.  The Indenture Trustee and its advisors shall provide to counsel to the Debtors and counsel to the Buyer invoices for unpaid fees and expenses at least five (5) Business Days before, or as soon as practicable after, the Effective Date.

vi.        **Consenting Noteholder Group Advisors Fees and Expenses**

On the later of the Effective Date or five (5) Business Days following the receipt of an invoice, the Distribution Agent shall pay in full in Cash any outstanding Consenting Noteholder Group Advisors Fees and Expenses to the extent they have not been paid pursuant to the DIP Orders without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. Such payments shall constitute a Distribution on account of the Allowed Senior Notes Claim. Each of the Consenting Noteholder Group Advisors shall provide to counsel to the Debtors and counsel to the Buyer invoices for unpaid fees and expenses at least five (5) Business Days before, or as soon as practicable after, the Effective Date. The Consenting Noteholder Group Advisor Fees and Expenses include, with respect to GLC Advisors & Co., LLC ("**GLC**"), only those fees and expenses due to GLC pursuant to its engagement letter dated as of November 14, 2023, between GLC and the Ad Hoc Committee of Noteholders (the "**Engagement Letter**") as set forth in sections 2(a) and 2(b)(i) of the Engagement Letter and, with respect to the incentive fee set forth in section 2(b)(ii) thereof, the incentive fee shall only qualify as Consenting Noteholder Group Advisors Fees in the amount equal to 10% of the aggregate Consideration paid by the Successful Bidder (as defined in the Bidding Procedures) in excess of the aggregate Consideration offered by the Stalking Horse Bidder (as defined in the Bidding Procedures) in its Stalking Horse Bid (as defined in the Bidding Procedures) that opens the bidding process pursuant to the Bidding Procedures, provided that, in the event the Stalking Horse Bid is the only Qualified Bid, no incentive fee shall be due and owing to GLC. For purposes of this definition, the term "Consideration" means Consideration as defined in the Engagement Letter, but only to the extent that such Consideration is received by the Consenting Noteholders pursuant to the Plan.

B.        **Classification and Treatment of Claims and Interests**

i.        **Summary of Classification**

All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified as set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.        Class Identification[10]

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Designation | Treatment | Entitled to Vote |
|:-----:|:-----------:|:---------:|:----------------:|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |

---

[10] For the avoidance of doubt, on the Effective Date, the treatment proposed herein shall be binding on all Holders of Claims and/or Interests, regardless of whether such Holders of Claims and/or Interests vote to accept the Plan or object to the Plan or any treatment hereunder.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 3 | Senior Notes Claims | Impaired | YES |
| 4 | General Unsecured Claims | Impaired | No (Deemed to Reject) |
| 5 | Intercompany Claims | Unimpaired | No (Presumed to Accept or Deemed to Reject) |
| 6 | Existing Equity Interests | Impaired | No (Deemed to Reject) |

*ii.*     **Treatment of Claims and Interests[11]**

*(a)*     Class 1 – Priority Non-Tax Claims

*Classification*: Class 1 consists of all Priority Non-Tax Claims.

*Treatment*: Except to the extent a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Priority Non-Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, payment in full in Cash in an amount equal to the Allowed amount of such Claim.

*Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Priority Non-Tax Claims.

*(b)*     Class 2 – Other Secured Claims

*Classification:* Class 2 consists of all Other Secured Claims.

*Treatment:* Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the later of (i) the Effective Date or (ii) the date such Other Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, at the discretion of the Distribution Agent (x) payment in full in Cash in an amount equal to the Allowed amount of such Claim; (y) such other treatment sufficient to render such Other Secured Claim Unimpaired; or (z) return of the applicable collateral or authorization of a setoff in satisfaction of the Allowed amount of such Other Secured Claim.

*Voting:* Class 2 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not

---

[11] For the avoidance of doubt, on the Effective Date, the treatment proposed herein shall be binding on all Holders of Claims and/or Interests, regardless of whether such Holders of Claims and/or Interests vote to accept the Plan or object to the Plan or any treatment hereunder.

entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to Other Secured Claims.

*(c)*    Class 3 – Senior Notes Claims

*Classification*:  Class 3 consists of all Senior Notes Claims.

*Allowance*: The Senior Notes Claims shall be Allowed in an amount of $67,856,181, which amount includes accrued but unpaid interest through the Petition Date.

*Treatment:*  Except to the extent a Holder of an Allowed Senior Notes Claim agrees to less favorable treatment, in full and final satisfaction of their Allowed Senior Notes Claims, on the Effective Date, Holders of Allowed Senior Notes Claims shall receive:

(i)    In the event that the Debtors pursue the transactions contemplated by the Restructuring Support Agreement and embodied in the Restructuring Term Sheet, and the Buyer is the Plan Sponsor purchasing the Reorganized Equity Interests pursuant to an Equity Purchase Agreement, Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date) shall receive their Pro Rata share of (a) the Cash Settlement Consideration and (b) their Pro Rata share of the Creditor Litigation Trust Beneficial Interests.

(ii)    In the event that the Debtors pursue an Alternative Restructuring, whether pursuant to an Equity Purchase Agreement or an Asset Purchase Agreement, whether pursuant to this Plan or a Sale Order, and the Buyer is an entity other that the Plan Sponsor, Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date) shall receive (i) the greater of their Pro Rata share of the (a) Cash Settlement Consideration or (b) Net Cash Proceeds; *provided* that if the Alternative Restructuring does not provide Equivalent Noteholder Treatment, the Restructuring Support Agreement has not been terminated pursuant to Section 13.01(g), (j) or (a) (resulting from a material breach by the Required Consenting Noteholders or the Ad Hoc Committee of Noteholders acting at the direction of the Required Consenting Noteholders) thereof and the Plan Sponsor Excusal Condition has not been satisfied, then, within 14 days after consummation of such Alternative Restructuring, the Plan Sponsor shall pay the Cash Settlement Differential to the Indenture Trustee for the benefit of the Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date); and (ii) their Pro Rata share of the Creditor Litigation Trust Beneficial Interests.

(iii)    In accordance with the Restructuring Support Agreement, (i) the Debtors' Chief Executive Officer as of the Petition Date shall receive no recovery on account of his Senior Notes Claims and (ii) as a class, Holders of Allowed Senior Notes Claims in Class 3 shall only be entitled to receive the full amount of the Senior Notes Claims, with interest to the extent permitted under the Bankruptcy Code, in accordance with the absolute priority rule.  To the extent, if any, that the Senior Notes Recovery exceeds the amount of the Allowed Senior Notes Claims, with interest as allowed by the Bankruptcy Code, the Excess Recovery, if any, shall be distributed on a Pro Rata basis to the Holders of Allowed General Unsecured Claims. To the extent not otherwise paid, Holders of Allowed Senior Notes Claims shall receive an amount equal to the outstanding reasonable and documented Indenture Trustee Fees and Expenses and the outstanding reasonable and documented Consenting Noteholder Group Advisors Fees and Expenses, which amount will be paid to

30

the Indenture Trustee or the applicable Consenting Noteholder Group Advisor on the Effective Date in cash as provided in Articles II.E and II.F of the Plan.

*Voting*: Class 3 is Impaired. Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

*(d)*    Class 4 – General Unsecured Claims

*Classification*: Class 4 consists of all General Unsecured Claims.

*Treatment*: On the Effective Date, (i) each Allowed General Unsecured Claim will be released and extinguished, and (ii) each holder of an Allowed General Unsecured Claim shall not receive any distribution on account of its General Unsecured Claim, unless the Senior Notes Recovery exceeds the Allowed Senior Notes Claims, which, in such circumstance, Holders of Allowed General Unsecured Claims would receive, on a Pro Rata basis, their share of the Excess Recovery, if any.

*Voting*: Class 4 is Impaired. Holders of General Unsecured Claims in Class 4 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Plan.

*(e)*    Class 5 – Intercompany Claims

*Classification*: Class 5 consists of all Intercompany Claims.

*Treatment*: Intercompany Claims shall be reinstated, cancelled, compromised, or provided such other treatment as determined by the Reorganized Debtors or the Buyer, as applicable.

*Voting*: Class 5 is Impaired or Unimpaired, as applicable. The holders of Allowed Intercompany Claims are either (i) deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan or (ii) conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan. The votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

*(f)*    Class 6 – Existing Equity Interests

*Classification*: Class 6 consists of all Equity Interests.

*Treatment*: On the Effective Date, Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise; *provided, however, that*, in the event the Debtors consummate an Equity Sale Transaction pursuant to an Equity Purchase Agreement, the Reorganized Debtors' corporate structure shall be reflected in the Restructuring Steps Memorandum and shall not otherwise be adversely affected by the Plan.

*Voting*: Class 6 is Impaired under the Plan. Holders of Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

### iii.  Special Provision Governing Unimpaired Claims

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to affect, diminish, or impair the Debtors', Reorganized Debtors', the Post-Effective Date Debtor(s)', Creditor Litigation Trustee's, or Debtor Liquidating Trustee's, as applicable, rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims.  Nothing in the Plan shall be deemed to be a waiver or relinquishment of any Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan.

### iv.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class.

### v.  Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Unimpaired or Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### C.  Means for Implementation

### i.  Plan Implementation

1.      The Debtors, with the assistance of Livingstone, have conducted a marketing and sale process in accordance with the Bidding Procedures.  Pursuant to the Bidding Procedures, the Debtors have designated the Successful Bidder and Back-Up Bidder, if any.  The Sale Transaction shall be consummated with the Successful Bidder on the Effective Date, or as otherwise set forth in a Sale Order (if any).  If the applicable Sale Transaction Documents with the Successful Bidder are terminated in accordance with their terms, the Sale Transaction shall be consummated with the Back-Up Bidder, if any, pursuant to the terms of its applicable Sale Transaction Documents upon the filing of a notice with the Bankruptcy Court (and without the need for further Bankruptcy Court approval).

2.      On the Effective Date, or as otherwise provided for in a Sale Order (if any), the Sale Transaction, or the proceeds derived from a Sale Transaction consummated under a Sale Order (if any), as applicable, shall be implemented in the following sequence:

If the Plan Sponsor (or its designee) is the Buyer pursuant to an Equity Purchase Agreement, following the discharge pursuant to section 1141 of the Bankruptcy Code of the Debtors, as follows:

a.  first, pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code, (a) the Creditor Litigation Trust Assets shall be transferred to, and vest in, the Creditor Litigation Trust free and clear of all Liens, Claims, charges, interests, or other encumbrances but subject to the Creditor Litigation Trust's obligations under the Plan; and (b) the Post-Effective Date Assets shall vest in the Post-Effective Date Debtor(s);

b.  second, (i) the Equity Interests of all of the Debtors will be cancelled, and (ii) pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code,  (a) 100% of the Reorganized Equity Interests of shall be issued or transferred to, as applicable, and vest free and clear of all Liens, Claims,

charges, interests, or other encumbrances in the Plan Sponsor (or its designee) in accordance with the applicable Sale Transaction Documents and the Restructuring Steps Memorandum, and (b) the Plan Administrator shall be deemed to hold one share of common equity in the Post-Effective Date Debtor solely for the benefit of Holders of Allowed Claims; provided that the Plan Administrator shall not be entitled to receive any Distribution on account of such common equity interest; and

c.   third, the Plan Sponsor shall remit the Sale Transaction Proceeds to an account or accounts designated by the Debtors.

In an Alternative Restructuring, as follows:

a.   First, pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code, (a) the Creditor Litigation Trust Assets shall be transferred to, and vest in, the Creditor Litigation Trust free and clear of all Liens, Claims, charges, interests, or other encumbrances but subject to the Creditor Litigation Trust's obligations under the Plan; and (b) the Post-Effective Date Assets shall vest in the Post-Effective Date Debtor(s) or the Debtor Liquidating Trust Assets shall vest in the Debtor Liquidating Trust, as applicable;

b.   Second, subject to the terms of the applicable Sale Transaction Documents, (i) if the Buyer consummates the Sale pursuant to an Asset Purchase Agreement, the Debtors shall consummate the Sale Transaction by, among other things, transferring the Purchased Assets to the Buyer free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or section 1123 of the Bankruptcy Code, the Plan, and the Confirmation Order, or, in the alternative, as and when set forth in the applicable Sale Order, and the Post Effective Date Assets shall vest in the Post-Effective Date Debtor(s) or (ii) if the Buyer consummates the Sale pursuant to an Equity Purchase Agreement, the Equity Interests of all of the Debtors will be cancelled, and pursuant to sections 1123, 1141(b), and 1141(c) of the Bankruptcy Code, and (I) 100% of the Reorganized Equity Interests of  shall be issued or transferred to, as applicable, and vest free and clear of all Liens, Claims, charges, interests, or other encumbrances in the Buyer (or its designee) in accordance with the applicable Sale Transaction Documents and the Restructuring Steps Memorandum, (II) the Post-Effective Date Assets shall vest in the Post-Effective Date Debtor(s) and (III) the Plan Administrator shall be deemed to hold one share of common equity in the Post-Effective Date Debtor solely for the benefit of Holders of Allowed Claims; provided that the Plan Administrator shall not be entitled to receive any Distribution on account of such common equity interest; *provided that* if the Buyer purchases the Reorganized Equity Interests of all of the Debtors, including Reorganized Nogin, then (I) 100% of the Reorganized Equity Interests shall be issued or transferred to, as applicable, to and vest free and clear of all Liens, Claims, charges, interests, or other encumbrances in the Buyer (or its designee) in accordance with the applicable Sale Transaction Documents and the Restructuring Steps Memorandum, and (II) the Debtor Liquidating Trust Assets shall vest in the Debtor Liquidating Trust;

c.   Third, the Buyer shall remit the Sale Transaction Proceeds to an account or accounts designated by the Debtors; and

d.   Fourth, if (x) the Alternative Restructuring does not provide Equivalent Noteholder Treatment, (y) the Restructuring Support Agreement has not been terminated pursuant to Section 13.01(g), (j) or (a) (resulting from a material breach by the Required Consenting Noteholders or the Ad Hoc Committee of Noteholders acting at the direction of the Required Consenting Noteholders) thereof and (z) the Plan Sponsor Excusal Condition has not been satisfied, then, within 14 days after consummation of the Alternative Restructuring, the Plan Sponsor shall pay an amount equal to the

Cash Settlement Differential to the Indenture Trustee for the benefit of the Holders of Allowed Senior Notes Claims (other than the Debtors' Chief Executive Officer as of the Petition Date).

ii.        **Liabilities, Obligations, or Claims**

All liabilities of, obligations of, or Claims against the Debtors that are Excluded Liabilities shall be transferred to the Debtor Liquidating Trust or the Plan Administrator, as applicable, to be satisfied in accordance with the Plan.

iii.        **Sources of Consideration for Plan Distributions**

The Distribution Agent shall fund Distributions and satisfy Allowed Claims under the Plan using Available Cash or Net Cash Proceeds, including Sale Transaction Proceeds, and if applicable, the Cash Settlement Differential, as applicable; *provided, however, that*, any post-Effective Date obligations of the (i) Creditor Litigation Trust shall be paid by Creditor Litigation Trustee (ii) the Debtor Liquidating Trust shall be paid by the Debtor Liquidating Trustee, and (iii) the Post-Effective Date Debtor(s) shall be paid by the Plan Administrator.  The Debtors shall make an initial distribution of Available Cash or Net Cash Proceeds on the Effective Date (or as soon thereafter as is practicable).

iv.        **Reorganized Equity Interests**

To the extent the Buyer seeks to purchase Reorganized Equity Interests, the Reorganized Debtors are authorized to issue or transfer, or cause to be issued or transferred, and shall issue or transfer, as applicable, the Reorganized Equity Interests to the Buyer without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The Reorganized Equity Interests shall be issued or transferred, as applicable, and distributed free and clear of all Liens, Claims, and other Interests.  All of the Reorganized Equity Interests issued or transferred pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid and non-assessable.

v.        **Plan Securities and Related Documentation; Exemption from Securities Laws**

The Reorganized Equity Interests issued under the Plan in connection with a Reorganization Transaction shall be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code, and such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as defined in section 1145(b) of the Bankruptcy Code) with respect to such securities. Such section 1145 exempt securities also generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

vi.        **Creditor Litigation Trustee and Creditor Litigation Trust**

1.        On or prior to the Effective Date, the Creditor Litigation Trust shall be established in accordance with the Creditor Litigation Trust Agreement for the purpose of receiving and liquidating the Creditor Litigation Trust Assets, including the prosecution of the Retained Causes of Action, and making Distributions to Creditor Litigation Trust Beneficiaries in accordance with the terms of the Plan and the Creditor Litigation Trust Agreement.

2.        <u>Funding of and Transfer of Assets into the Creditor Litigation Trust</u>.  On the Effective Date, the Debtors shall transfer the Creditor Litigation Trust Assets to the Creditor Litigation Trust, and all such

assets shall vest in the Creditor Litigation Trust on such date, to be administered by the Creditor Litigation Trust, in accordance with the Plan and the Creditor Litigation Trust Agreement. The act of transferring the Creditor Litigation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Creditor Litigation Trust as if the asset or right was still held by the Debtors.

3.    Creditor Litigation Trustee. The Creditor Litigation Trustee shall serve as the initial trustee of the Creditor Litigation Trust and shall be identified in the Plan Supplement. The powers, rights, and responsibilities of the Creditor Litigation Trustee shall be as specified in the Creditor Litigation Trust Agreement and Plan.

4.    Creditor Litigation Trust Agreement. Prior to the Effective Date, the Debtors shall file with the Bankruptcy Court a form of Creditor Litigation Trust Agreement as drafted by the Ad Hoc Committee of Noteholders and in form and substance acceptable to the Debtors, the Ad Hoc Committee of Noteholders and the Plan Sponsor, which shall be included as part of the Plan Supplement.

5.    Fees and Expenses of the Creditor Litigation Trust. From and after the Effective Date, Creditor Litigation Trust Expenses shall be paid from the Creditor Litigation Trust Assets in the ordinary course of business, in accordance with the Plan and the Creditor Litigation Trust Agreement. The compensation of the Creditor Litigation Trustee shall be set forth in the Plan Supplement. Without any further notice to any party or action, order, or approval of the Bankruptcy Court, the Creditor Litigation Trustee, on behalf of the Creditor Litigation Trust, may employ and pay in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtor) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Creditor Litigation Trustee, are necessary to assist the Creditor Litigation Trustee in the performance of the Creditor Litigation Trustee's duties under the Plan and the Creditor Litigation Trust Agreement, subject to any limitations and procedures established by the Creditor Litigation Trust Agreement.

6.    Tax Treatment of Creditor Litigation Trust.

a.    It is intended that the Creditor Litigation Trust shall qualify as a "liquidating trust" for U.S. federal income tax purposes. Accordingly, (i) the terms of the Creditor Litigation Trust shall be set forth in the Creditor Litigation Trust Agreement; (ii) the Creditor Litigation Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of Allowed Senior Notes Claims receiving beneficial interests in the Creditor Litigation Trust (whether Allowed on or after the Effective Date), consistent with the terms of the Plan; (iii) the Holders of Allowed Senior Notes Claims shall be treated as the beneficiaries and grantors of the Creditor Litigation Trust; (iv) the primary purpose of the Creditor Litigation Trust shall be the liquidation and distribution of the Creditor Litigation Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of Allowed Senior Notes Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Creditor Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Creditor Litigation Trust Assets and provide for the orderly liquidation thereof; (v) all parties shall report consistently with such treatment, including (A) the deemed receipt of the Creditor Litigation Trust Assets (subject to applicable liabilities and obligations) by the Holders of Allowed Senior Notes Claims, followed by (B) the deemed transfer of such assets to the Creditor Litigation Trust; (vi) all parties shall report consistently with the valuation of the Assets transferred to the Creditor Litigation Trust as determined by the Creditor Litigation Trustee; (vii) the Creditor Litigation Trustee shall be responsible for filing returns for the Creditor Litigation

Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); (viii) the Creditor Litigation Trustee shall annually provide to each Creditor Litigation Trust Beneficiary a separate statement regarding the receipts and expenditures of the Creditor Litigation Trust as relevant for U.S. federal income tax purposes; and (ix) all items of income, deductions, and credit loss of the Creditor Litigation Trust shall be allocated for federal income tax purposes to the Creditor Litigation Trust Beneficiaries in such manner as the Creditor Litigation Trustee deems reasonable and appropriate.

b.  All parties (including the Debtors, the Creditor Litigation Trust, and the Creditor Litigation Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the Creditor Litigation Trust (including as a result of treatment, in whole or in part, as a disputed ownership fund or otherwise) shall be paid by the Creditor Litigation Trust.

c.  The Creditor Litigation Trust may request, if necessary, an expedited determination of any unpaid tax liability of the Creditor Litigation Trust under Bankruptcy Code section 505(b) for all taxable periods of the Creditor Litigation Trust through the dissolution of the Creditor Litigation Trust as determined under applicable tax laws.

### vii.    Debtor Liquidating Trustee and Debtor Liquidating Trust

1.  In the event that no Post-Effective Date Debtor(s) exists on or after closing of the Sale Transaction, the following provisions shall apply:

2.  On or prior to the Effective Date, the Debtor Liquidating Trust shall be established in accordance with the Debtor Liquidating Trust Agreement for the purpose of receiving and liquidating the Debtor Liquidating Trust Assets, reviewing, objecting to, and resolving all Disputed Claims (other than Senior Notes Claims), making distributions to Holders of Allowed Claims (other than Senior Notes Claims) in accordance with the terms of the Debtor Liquidating Trust Agreement and the Plan, and otherwise implementing the Plan.

3.  <u>Funding of and Transfer of Assets into the Debtor Liquidating Trust</u>.  On the Effective Date, the Debtors shall transfer the Debtor Liquidating Trust Assets to the Debtor Liquidating Trust, and all such assets shall vest in the Debtor Liquidating Trust on such date, to be administered by the Debtor Liquidating Trust, in accordance with the Plan and the Debtor Liquidating Trust Agreement.  The act of transferring the Debtor Liquidating Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Debtor Liquidating Trust as if the asset or right was still held by the Debtors.

4.  <u>Debtor Liquidating Trust Trustee</u>.  The Debtor Liquidating Trustee shall serve as the initial trustee of the Debtor Liquidating Trust and shall be identified in the Plan Supplement.  The powers, rights, and responsibilities of the Debtor Liquidating Trustee shall be as specified in the Debtor Liquidating Trust Agreement and Plan.

5.  <u>Debtor Liquidating Trust Agreement</u>.  Prior to the Effective Date, the Debtors shall file with the Bankruptcy Court a form of Debtor Liquidating Trust Agreement as part of the Plan Supplement.

6.  <u>Fees and Expenses of the Debtor Liquidating Trust</u>.  From and after the Effective Date, Debtor Liquidating Trust Expenses shall be paid from the Debtor Liquidating Trust, in accordance with the Plan and the Debtor Liquidating Trust Agreement.  The compensation of the Debtor Liquidating Trustee shall be set forth in the Plan Supplement.

7.      Tax Treatment of Debtor Liquidating Trust

a.    It is intended that the Debtor Liquidating Trust shall qualify as a "liquidating trust" for U.S. federal income tax purposes.  Accordingly, (i) the terms of the Debtor Liquidating Trust shall be set forth in the Debtor Liquidating Trust Agreement; (ii) the Debtor Liquidating Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the Holders of all Allowed Claims receiving beneficial interests in the Debtor Liquidating Trust (other than the Holders of Allowed Senior Notes Claims, and whether Allowed on or after the Effective Date), consistent with the terms of the Plan; (iii) the Holders of Allowed Claims (other than Holders of Allowed Senior Notes Claims) shall be treated as the beneficiaries and grantors of the Debtor Liquidating Trust; (iv) the primary purpose of the Debtor Liquidating Trust shall be the liquidation and distribution of the Debtor Liquidating Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of Claims in accordance with this Plan (other than Senior Notes Claims), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Debtor Liquidating Trust's liquidating purpose and reasonably necessary to conserve and protect the Debtor Liquidating Trust Assets and provide for the orderly liquidation thereof; (v) all parties shall report consistently with such treatment, including (A) the deemed receipt of the Debtor Liquidating Trust Assets (subject to applicable liabilities and obligations) by the Holders of Allowed Claims (other than Holders of Allowed Senior Notes Claims), followed by (B) the deemed transfer of such assets to the Debtor Liquidating Trust; (vi) all parties shall report consistently with the valuation of the Assets transferred to the Debtor Liquidating Trust as determined by the Debtor Liquidating Trustee; (vii) the Debtor Liquidating Trustee shall be responsible for filing returns for the Debtor Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); (viii) the Debtor Liquidating Trustee shall annually provide to each Debtor Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the Debtor Liquidating Trust as relevant for U.S. federal income tax purposes; and (ix) all items of income, deductions, and credit loss of the Debtor Liquidating Trust shall be allocated for federal income tax purposes to the Debtor Liquidating Trust Beneficiaries in such manner as the Debtor Liquidating Trustee deems reasonable and appropriate.

b.    All parties (including the Debtors, the Debtor Liquidating Trust, and the Debtor Liquidating Trust Beneficiaries) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.  Any taxes (including with respect to earned interest, if any) imposed on the Debtor Liquidating Trust (including as a result of treatment, in whole or in part, as a disputed ownership fund or otherwise) shall be paid by the Debtor Liquidating Trust.

c.    The Debtor Liquidating Trust may request, if necessary, an expedited determination of any unpaid tax liability of the Debtor Liquidating Trust under Bankruptcy Code section 505(b) for all taxable periods of the Debtor Liquidating Trust through the dissolution of the Debtor Liquidating Trust as determined under applicable tax laws.

viii.      **Plan Administrator**

1.      In the event that one or more Post-Effective Date Debtor(s) exists on or after closing of the Sale Transaction, the following provisions shall apply:

2.      On or prior to the Effective Date, the Plan Administrator shall be appointed and thereafter serve in accordance with this Plan and the Plan Administrator Agreement for the purpose of liquidating the Post-Effective Date Assets, reviewing, objecting to, and resolving all Disputed Claims (other than Senior Notes Claims), making distributions to Holders of Allowed Claims (other than Senior Notes Claims) in accordance with the terms of this Plan and the Plan Administrator Agreement, and otherwise implementing the Plan.

3.      <u>Funding of and Transfer of Assets into the Post-Effective Date Debtor(s)</u>.  On the Effective Date, the Debtors shall transfer the Post-Effective Date Assets to the Post-Effective Date Debtor(s), and all such assets shall vest in the Post-Effective Date Debtor(s)on such date, to be administered by the Plan Administrator, in accordance with the Plan and the Plan Administrator Agreement.  The act of transferring the Post-Effective Date Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Plan Administrator Trust as if the asset or right was still held by the Debtors.

4.      <u>Plan Administrator</u>.  The Plan Administrator shall be identified in the Plan Supplement.  The powers, rights, and responsibilities of the Plan Administrator shall be as specified in the Plan Administrator Agreement and Plan.

5.      <u>Plan Administrator Agreement</u>.  Prior to the Effective Date, the Debtors shall file with the Bankruptcy Court a form of Plan Administrator Agreement as part of the Plan Supplement.

6.      <u>Fees and Expenses of the Plan Administrator</u>.  From and after the Effective Date, Plan Administrator Expenses shall be paid from the Post-Effective Date Debtor(s), in accordance with the Plan and the Plan Administrator Agreement.  The compensation of the Plan Administrator shall be set forth in the Plan Supplement.

<i>ix.</i>        <b>Cancellation of Existing Interests, Indebtedness, and Other Obligations</b>

Except for the purpose of evidencing a right to a Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Buyer or the Reorganized Debtors, as applicable, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the Senior Notes, or any indebtedness or other obligations thereunder, and any Interest, and any rights of any holder in respect thereof, including the Senior Notes and the Senior Notes Indenture,  shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged, subject to, in the case of the Senior Notes and Senior Notes Indenture, the payment of the Indenture Trustee Fees and Expenses and except with respect to such other rights of the Indenture Trustee, including indemnification rights and charging liens, that survive the termination of the Senior Notes Indenture pursuant to their terms, which shall continue in full force and effect.

Notwithstanding such cancellation and discharge, all agreements, instruments, and other documents evidencing or issued pursuant to the Senior Notes shall continue in effect to the extent necessary (i) to allow the Holders of Senior Notes Claims to receive Distributions; (ii) to allow the Creditor Litigation Trustee and Indenture Trustee to receive and make post-Effective Date Distributions or take such other action pursuant to the Plan on account of such Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the Holders of such Claims; (iii) to allow the Senior Noteholders and the Indenture Trustee to retain their respective rights and obligations vis-à-vis other Senior Noteholders, pursuant to any applicable loan documents; (iv) to preserve any rights of the Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any Distributions to the Senior Noteholders

under the Senior Notes, including any rights to priority of payment and/or to exercise charging liens pursuant to the Senior Notes Indenture and enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; (v) to allow the Indenture Trustee to enforce any obligations owed to it under the Plan; (vi) to allow the Indenture Trustee to exercise rights and enforce obligations relating to the interests of the Senior Noteholders, including enforcement of any subordination agreement; (vii) to allow the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (viii) to permit the Indenture Trustee to perform and seek compensation and reimbursement for any function necessary to effectuate the foregoing; provided, that, nothing in Article IV.G of the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any liability or expense to the Reorganized Debtors.

Except for the foregoing, subsequent to the performance by the Indenture Trustee of its obligations pursuant to the Plan, the Indenture Trustee and its agents shall be relieved and discharged from all further duties and responsibilities related to the Plan and the Senior Notes Indenture, except with respect to such other rights that survive the termination of the Senior Notes Indenture.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

> *x.*      **Corporate Action**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (i) the cancellation of the Equity Interests, (ii) the issuance of the Reorganized Equity Interests, if applicable; (iii) the selection of the Creditor Litigation Trustee and the formation of the Creditor Litigation Trust and the execution and delivery thereof; (iv) the selection of the Debtor Liquidating Trustee and the formation of the Debtor Liquidating Trust and the execution and delivery thereof, or the appointment of the Plan Administrator and the execution of the Plan Administrator Agreement, as applicable; (v) consummation of the Sale Transaction, as applicable; (vi) execution of and performance under the Definitive Documents; and (vii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the form of the Creditor Litigation Trust Agreement, the Creditor Litigation Trust, the Debtor Liquidating Trustee, the form of the Debtor Liquidating Trust Agreement, or the Debtor Liquidating Trust and any corporate or other organizational action required by the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, or the Debtor Liquidating Trust in connection with the Plan shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, or the Debtor Liquidating Trust. Before, on, or after the Effective Date, as applicable, the appropriate officers of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, or the Debtor Liquidating Trust, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary

or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, or the Debtor Liquidating Trust, as applicable, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### xi. Effectuating Documents; Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, the Debtor Liquidating Trust, and the Buyer, as applicable, may take all actions as may be necessary or appropriate in their discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Definitive Documents; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) the issuance of securities; and (v) all other actions that the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee, the Creditor Litigation Trust, the Debtor Liquidating Trustee, the Debtor Liquidating Trust, or the Buyer determine to be necessary or appropriate, including in connection with the consummation of the Sale Transaction and making filings or recordings that may be required by applicable law in connection with the Plan, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule or the governing documents of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Buyer (collectively, the "**Restructuring Transactions**").

Each officer, manager, or member of the board of directors of the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, Creditor Litigation Trust or Debtor Liquidating Trust is (and each officer, manager, or member of the board of directors of the Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trustee and the Debtor Liquidating Trustee, as applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Plan Administrator, the Creditor Litigation Trust or the Debtor Liquidating Trust, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders, members, directors or managers of the Debtors, the Reorganized Debtors, the Creditor Litigation Trust or Debtor Liquidating Trust the Creditor Litigation Trust or the Debtor Liquidating Trust) except for those expressly required pursuant to the Plan.

The Debtors shall be authorized to implement the Sale Transaction, including the creation of the Creditor Litigation Trust and the Debtor Liquidating Trust, in the manner most tax efficient to (x) the Reorganized Debtors, (y) the Creditor Litigation Trust and (z) the Debtor Liquidating Trust, though the Debtors shall reasonably prioritize tax efficiency with respect to the Reorganized Debtors over tax efficiency with respect to the Credit Litigation Trust and the Debtor Liquidating Trust to the extent of any conflict.

All matters provided for herein involving the corporate structure of the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust, to the extent applicable, or any corporate or related action required by the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or Debtor Liquidating Trust in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, directors or managers of the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or Debtor Liquidating Trust and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or Debtor Liquidating Trust.

### xii.        Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments, or documents; (b) the creation of any Lien, mortgage, deed of trust or other security interest; (c) all sale transactions consummated by the Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust pursuant to the Plan (including the Plan Supplement) on and after the Confirmation Date, including any transfers in furtherance of the Plan; (d) any assumption or sale by the Debtors, the Post-Effective Date Debtor(s), or the Creditor Litigation Trust or the Debtor Liquidating Trust of their interests in unexpired leases of nonresidential real property or Executory Contracts pursuant to section 365(a) of the Bankruptcy Code; and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan or Plan Supplement, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, intangible tax, deed stamps, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### xiii.        Insurance Policies

All of the Insurance Policies (including, but not limited to, the D&O Insurance Policies) and all rights and obligations of the Debtors under the Insurance Policies will automatically become vested, unaltered, in the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable, as of the Effective Date without necessity for further approvals or orders, unless such Insurance Policies (i) have been assumed and assigned to the Buyer, (ii) were rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, or (iii) are required to monetize a recovery on a Retained Cause of Action, in which case the proceeds of any recovery under such Insurance Policies shall vest unaltered in the Creditor Litigation Trust. To the extent that any Insurance Policies are deemed Executory Contracts, unless such Insurance Policies have been assumed and assigned to the Buyer or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, this Plan will constitute a motion to assume and assign to the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable, permit to "ride through" and ratify such Insurance Policies and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute both approval of such assumption and assignment pursuant to sections 105 and 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates.  Nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, the Debtors, the Debtor Liquidating Trust, the Post-Effective Date Debtor(s), or any other individual or entity, as

applicable, under (or affect the coverage under) any Insurance Policies, except that all rights and claims in respect of recovery on a deductible or retention with respect to the D&O Insurance Policies is waived such that any collection in connection with claims by the Creditor Litigation Trust is limited to the proceeds of the D&O Insurance Policies themselves, reduced by any amount of deductible or retention.  For the avoidance of doubt, no person or entity shall be required to satisfy any deductible or self-insured retention or advance any funds whatsoever in order to recover under the D&O Insurance Policies.  Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, a Sale Order (if any), and any other document related to any of the foregoing, on the Effective Date: (i) nothing shall alter or modify the terms and conditions of and/or any rights, benefits, claims, rights to payments, or recoveries under any Insurance Policies; and (ii) for the avoidance of doubt, nothing shall authorize any party, including the Buyer in connection with the Sale Transaction, to amend, alter, modify, or terminate in any way, any Insurance Policy, including, but not limited to, any D&O Liability Insurance Policy.

> ### xiv.    Expedited Tax Determination of the Debtors

The Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust, as applicable, may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed or to be filed for or on behalf of the Debtors for all taxable periods ending after the Petition Date through the Effective Date; provided, however, that, as applicable, the Debtors shall keep the advisors to the Ad Hoc Committee of Noteholders reasonably informed with respect to the status of such request.

> ### xv.    Actions Required from Debtors' Insiders and Affiliates to Exempt Themselves from Receiving a Recovery on Account of Senior Note Claims

The Debtors shall use reasonable efforts to cause their Chief Executive Officer as of the Petition Date who beneficially holds an interest in the Allowed Senior Notes Claims to take any action reasonably requested by the Ad Hoc Committee of Noteholders, DTC or the Indenture Trustee to ensure that he does not receive any portion of the Senior Notes Recovery on account of his Allowed Senior Notes Claims and the Chief Executive Officer shall take any such action which the Ad Hoc Committee of Noteholders, DTC or the Indenture Trustee may reasonably request including, but not limited to, assigning any portion of the Senior Notes Recovery which he may inadvertently receive to the Creditor Litigation Trust for redistribution to the holders of Allowed Secured Note Claims (other than the Chief Executive Officer). The Creditor Litigation Trust and the Ad Hoc Committee of Noteholders shall have standing to enforce this provision and to recover fees and costs from the Chief Executive Officer incurred in enforcing this provision.

> ### xvi.    Consolidation of the Debtors for Plan Purposes

The Debtors' Estates will be consolidated for administrative purposes related to this Plan, including for purposes of (1) implementing this Plan, (2) voting, (3) assessing whether the standards for Confirmation have been met, and (4) calculating and making Distributions under this Plan.

On the Effective Date (1) all of the Debtors' assets and liabilities will be merged; (2) all guarantees or responsibility of one Debtor for the obligations of any other Debtor will be eliminated, and all guarantees or responsibility executed by multiple Debtors of the obligations of any other Entity will be consolidated into a single obligation, so that any Claim against any Debtor and any guarantee or responsibility thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors; and (3) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be deemed Filed against, and will be a single obligation of, the Debtors.  This consolidation will not affect (a) the vesting of the Debtors' assets in the Reorganized Debtors, the Buyer, the Creditor Litigation Trust and the Debtor Liquidating Trust, as applicable; (b) the right to distributions from any Insurance Policies

or proceeds of the policies; (c) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; (d) any Causes of Action, including the Retained Causes of Action, or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no consolidation of the Estates in any respect; or (e) the rights of the Debtors, the Creditor Litigation Trust and the Debtor Liquidating Trust; to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor.

### D.     Treatment of Executory Contracts and Unexpired Leases

#### i.     General Treatment

On January 18, 2024, the Debtors filed the Assumption Notice, which identified Executory Contracts and Unexpired Leases that may be assumed and assigned in connection with the Sale Transaction, Cure Costs, and related procedures for objecting to the assumption and assignment of the Executory Contracts and Unexpired Leases listed therein.

1.     Sale Transaction Consummated Under the Plan

To the extent the Sale Transaction is consummated pursuant to the Plan, the Executory Contracts and Unexpired Leases identified in the List of Assumed Contracts (subject to any right to amend or supplement), which shall be filed as part of the Plan Supplement, shall be assumed on the Effective Date by the Reorganized Debtors or the Buyer, as applicable.  To the extent an Executory Contract or Unexpired Lease is not listed on the List of Assumed Contracts, all such remaining Executory Contracts and Unexpired Leases shall be deemed rejected by the Debtors on the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or was terminated pursuant to its terms or by agreement of the parties thereto; (iii) is the subject of a pending motion to assume or reject as of the Effective Date; (iv) is an Insurance Policy; or (v) is one in which any Bluestar Alliance member is a counterparty, in a circumstance where the Plan Sponsor is the Buyer of the Reorganized Equity or the Assets of the Debtors pursuant to this Plan.

For the avoidance doubt, as described in more detail in this Disclosure Statement, as of the Effective Date, and solely to the extent the Plan Sponsor is the Successful Bidder, the Plan Sponsor shall assume all Executory Contracts with all members of the Bluestar Alliance.

To the extent the Sale Transaction is consummated pursuant to the Plan, subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Debtors have provided adequate assurance of future performance under such assumed Executory Contract and Unexpired Lease.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtors or the Buyer, as applicable, in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

If an Assumption Dispute is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the Closing Date or Effective Date, the Debtors and the Buyer may determine that any contract subject to such resolved Assumption Dispute will no longer be assumed and assigned pursuant to the applicable transaction.

2.      Sale Transaction Consummated Under a Sale Order

To the extent the Sale Transaction is not consummated pursuant to the Plan and the Buyer consummates an Asset Purchase Agreement pursuant to a Sale Order, the terms of the Sale Order and the Sale Transaction Documents approved pursuant to the terms of such Sale Order, shall govern the assumption or rejection of any Executory Contract or Unexpired Lease, as more fully set forth therein.  To the extent an Executory Contract or Unexpired Lease is not assumed and assigned pursuant to the Sale Order and applicable Sale Transaction Documents, all such remaining Executory Contracts and Unexpired Leases shall be deemed rejected by the Debtors on the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or was terminated pursuant to its terms or by agreement of the parties thereto; (iii) is the subject of a pending motion to assume or reject as of the Effective Date; or (iv) is an Insurance Policy.  The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

> ii.      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

1.      Sale Transaction Consummated Under the Plan

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree, in each case subject to the Sale Transaction Documentation.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

If there is an Assumption Dispute pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Cost), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided, that*, the Debtors, the Reorganized Debtors, the Plan Administrator, the Creditor Litigation Trustee, the Debtor Liquidating Trustee or the Buyer, as applicable, may settle any dispute regarding the Cure Cost or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent an Assumption Dispute relates solely to the Cure Cost, and such Assumption Dispute is not consensually resolved or finally determined by the Bankruptcy Court prior to the Closing Date (as defined in the Equity Purchase Agreement or Asset Purchase Agreement, as applicable) with respect to any assumed Executory Contract or Unexpired Lease, so long as the Reorganized Debtors or the Buyer, as applicable, remains responsible to satisfy the Allowed Cure Costs, subject to entry by the Bankruptcy Court of the Confirmation Order, the Debtors may assume such Executory Contract at the Closing (as defined in the Equity Purchase Agreement or Asset Purchase Agreement, as applicable) and upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection, the Buyer or Reorganized Debtors shall promptly pay to such non-Debtor counterparty the Allowed amount of the Cure Costs owing to such non-Debtor counterparty with respect to such Assumed Contract.

2.    Sale Transaction Consummated Under a Sale Order

In the event that the Sale Transaction is consummated pursuant to a Sale Order, the Sale Order and the terms of the applicable Sale Transaction Documents approved pursuant to such Sale Order shall govern the resolution of any assumption and assignment related disputes.

### iii.    Rejection Damages Claims

In the event that the rejection of an Executory Contract or Unexpired Lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 4 (General Unsecured Claims). Such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust, unless a Proof of Claim is filed in accordance with the Claims Bar Date Order by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.

### iv.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, including a Sale Order (if any), each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### v.    Reservation of Rights

The Debtors may amend the List of Assumed Contracts and any cure notice until the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any Executory Contract or Unexpired Lease and/or (ii) amend the proposed Cure Cost. The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust have any liability thereunder.

Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, or the Post-Effective Date Debtor(s) under any executory or non-executory contract or any unexpired or expired lease. Further, nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), as applicable, under any executory or non-executory contract or any unexpired or expired lease.

E.    **Provisions Governing Distributions**

i.    **Distribution Date**

Except as otherwise provided in the Plan, in the Creditor Litigation Trust Agreement or in the Debtor Liquidating Trust Agreement, any Distributions under the Plan prior to the Effective Date shall be made by the Debtors. After the Effective Date, the Creditor Litigation Trust or the Debtor Liquidating Trust, as applicable, shall from time to time shall make further Distributions under the Plan; provided, however, that the terms of the Professional Fee Escrow Agreement shall govern the disposition of any amounts in the Professional Fee Account, which shall be disbursed by the Professional Fee Escrow Agent in accordance with the Professional Fee Escrow Agreement.

ii.    **Rights and Powers of Distribution Agent**

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all Distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

iii.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all Distributions to any Holder of an Allowed Claim shall be made by the Distribution Agent, who shall transmit such Distribution to the applicable Holders, including the Indenture Trustee for the Senior Noteholders, of Allowed Claims on behalf of the Debtors.

Notwithstanding any provision of the Plan to the contrary, Distributions to Holders of Allowed Senior Notes Claims shall be made to or at the direction of the Indenture Trustee for further distribution on account of Allowed Senior Notes Claims held under CUSIP 65528NAA3, in accordance with the terms of the Senior Notes Indenture; provided that the Indenture Trustee shall not be required to make distributions to the Debtors' Chief Executive Officer as of the Petition Date on account of his Allowed Senior Notes Claims held under CUSIP 65528NAB1. Such Distributions shall be subject in all respects to the rights of the Indenture Trustee to assert its charging lien against such Distributions as set forth in the Senior Notes Indenture. The Indenture Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors, Reorganized Debtors, the Post-Effective Date Debtor(s), the Liquidating Trustee, the Creditor Litigation Trustee, or the Plan Administrator, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Senior Notes Claims that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date of the Plan, or as soon as reasonably practicable thereafter. In no event shall the Indenture Trustee (in any capacity) be responsible for any manual, paper, or similar physical, and/or individualized method of distribution or other method of distribution that is not customary for the Indenture Trustee under the circumstances. The Indenture Trustee shall not incur any liability whatsoever on account of any Distributions under the Plan, except for fraud, gross negligence, or willful misconduct. The Reorganized

46

Debtors and the Creditor Litigation Trustee, as applicable, shall reimburse the Indenture Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date in connection with the implementation of the Plan, including making Distributions pursuant to, and in accordance with, the Plan, without the need for further approval or order of the Bankruptcy Court.

For the avoidance of doubt, notwithstanding anything to the contrary in the Indenture, and in furtherance of implementation of the Plan, the Indenture Trustee may take any action reasonably requested by the Debtors to ensure that no distribution is made to the Debtors' Chief Executive Officer as of the Petition Date on account of his Allowed Senior Notes Claims, including, but not limited to, the chilling of CUSIP 65528NAB1 with DTC, and the Indenture Trustee shall have no obligation to make and/or direct that distributions be made to the Debtors' Chief Executive Officer as of the Petition Date on account of his Allowed Senior Notes Claims, including on CUSIP 65528NAB1.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to a Holder is returned as undeliverable, no further Distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder as soon as reasonably practicable without interest; provided, that, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such Distribution. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.C.3 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed Distribution had been Disallowed), and all other unclaimed property or interests in property shall revert to and vest in the Creditor Litigation Trust, the Debtor Liquidating Trust, the Reorganized Debtors, or the Post-Effective Date Debtor(s), as applicable, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred. Nothing in the Plan shall require the Distribution Agent to attempt to locate Holders to whom Distributions were undeliverable.

A Distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular Distribution or, in the case of Distributions made by check, negotiated such check; (ii) given notice to the Distribution Agent of an intent to accept a particular distribution; (iii) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

iv.     **Compliance with Tax and Other Requirements**

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on the Distribution Agent by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other

tax obligations, on account of such Distribution. The Distribution Agent in making Distributions pursuant to the Plan, has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to the Distribution Agent for payment of any such tax obligations. Additionally, in the case of a non-Cash Distribution that is subject to withholding, the Distribution Agent has the right, but not the obligation, to withhold an appropriate portion of such property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the Distribution Agent for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property. The Distribution Agent reserves the right to allocate all Distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Person designated by the Distribution Agent (which Entity shall subsequently deliver to the Distribution Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt from information reporting under the Tax Code and provides to the Distribution Agent notice and evidence of such exemption. If such request is made by the Distribution Agent or such other Person designated by the Distribution Agent and the Holder fails to comply within ninety (90) days after the request is made, the amount of such Distribution shall irrevocably revert to the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Post-Effective Date Debtor(s), as applicable, and any Claim in respect of such Distribution shall be forever barred from assertion against the Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, and their respective property.

<i>v.</i>      <b>Allocations</b>

Unless otherwise required by law (as reasonably determined by the Distribution Agent), Distributions shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of such Claims, including any portion of such Claims for accrued but unpaid interest as Allowed under the Plan.

<i>vi.</i>      <b>No Postpetition Interest on Claims</b>

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court, postpetition interest shall not be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

<i>vii.</i>      <b>Setoffs and Recoupment</b>

Except as otherwise expressly provided in the Plan, the Distribution Agent may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Distribution Agent may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trustee or the Debtor Liquidating Trustee of any such Claim they may have against the Holder of such Claim; *provided, that*, for the avoidance of doubt, in no event shall the Distribution Agent be able to apply, in any such setoff or recoupment, any Cause of Action acquired by the Buyer pursuant to the Sale Transaction. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trustee or the Debtor Liquidating Trustee, as applicable, unless (i) the Debtors have consented (which consent shall not be unreasonably withheld) or (ii) such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication

48

in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### viii.    Claims Paid or Payable by Third Parties

1.    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Distribution Agent.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Distribution Agent on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the Distribution Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    Claims Payable by Insurance Carriers

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained therein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### F.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### i.    Claims and Interests Administration Responsibilities

Except as otherwise expressly provided in the Plan the Creditor Litigation Trust Agreement, the Debtor Liquidating Trust Agreement or the Plan Administrator Agreement, as applicable, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Debtor Liquidating Trustee, the Creditor Liquidating Trustee, and the Plan Administrator shall have the authority to: (i) file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Debtor Liquidating Trustee, the Creditor Liquidating Trustee, and the Plan Administrator shall have and retain any and all applicable rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim or Disputed Interest.

49

ii.    **Estimation of Claims**

Before or after the Effective Date, the Debtors, the Plan Administrator or the Debtor Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Distribution Agent may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

iii.    **Adjustment to Claims Register Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtor Liquidating Trustee or Plan Administrator, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

iv.    **Time to File Objections to Claims**

The Debtor Liquidating Trustee or Plan Administrator, as applicable, shall be entitled to object to Claims (other than the Senior Note Claims, which may be objected to by the Creditor Litigation Trustee).  Any objections to Proof of Claims shall be served and filed on or before the later of (a) 180 days after the Effective Date, and (b) on such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Creditor Litigation Trustee, by the Debtor Liquidating Trustee or Plan Administrator, as applicable.  The expiration of such period shall not limit or affect the Debtors' or the Distribution Agent's rights to dispute Claims asserted in the ordinary course of business other than through a proof of Claim.

v.    **Disallowance of Claims**

Any Claims held by Entities from which property is recoverable pursuant to a Cause of Action under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code (other than any Cause of Action that is an Assumed Contract (as defined in the applicable Sale Transaction Documents)), shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or

paid to the Creditor Litigation Trust, the Debtor Liquidating Trust, the Reorganized Debtors or the Post-Effective Date Debtor(s), as applicable.

> ### vi.    Late Claims

On or after the Claims Bar Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed without the prior authorization of the Bankruptcy Court or the Distribution Agent.

> ### vii.    Distributions After Allowance; Disputed Claims Reserve

On each Distribution Date, the Debtors, the Plan Administrator or the Debtor Liquidating Trustee, as applicable, shall retain a Disputed Claims Reserve.  As soon as reasonably practicable after a Disputed Claim ultimately becomes an Allowed Claim that is entitled to a Distribution under the Plan, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan without any interest, dividends, or accruals to be paid on account of such Claim; *provided, that*, such distribution shall not exceed the amount retained with respect to such Claim.  After the resolution of a Disputed Claim, the Debtors, the Plan Administrator, or the Debtor Liquidating Trustee, as applicable, shall transfer any amounts that were retained for such Disputed Claim that do not become Allowed to the Indenture Trustee for the benefit of the Holders of Allowed Senior Notes Claims, in accordance with the Plan.

> ## G.    Settlement, Release, Injunction, and Related Provisions

> ### i.    Vesting of Assets

On the Effective Date, as applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, (i)(a) if an Equity Sale Transaction is consummated, all property of the Debtors' Estates acquired by the Buyer under the Equity Purchase Agreement shall vest in the Reorganized Debtors and the Reorganized Equity Interests shall vest in the Buyer, or (b) if an Asset Sale Transaction is consummated pursuant to the Plan, all property of the Debtors' Estates acquired by the Buyer under the Asset Purchase Agreement shall vest in the Buyer; (ii) other than the Creditor Litigation Trust Assets, all other remaining property of the Debtors' Estates under any Sale Transaction, whether remaining after application of (a) or (b) of the preceding clause or consummation of an Asset Purchase Agreement pursuant to a Sale Order, shall vest in the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable, in each case, free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan, the Confirmation Order, and the Creditor Litigation Trust Agreement; and (iii) the Creditor Litigation Trust Assets shall vest in the Creditor Litigation Trust.  On and after the Effective Date, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Buyer, the Creditor Litigation Trust and the Debtor Liquidating Trust may take any action, including, without limitation, the operation of its business, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.

> ### ii.    Binding Effect

As of the Effective Date, the Plan shall bind all Holders of Claims against and Interests in the Debtors and their successors and assigns, notwithstanding whether any such Holders were (a) Impaired or Unimpaired

under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any Distribution under the Plan.

### iii.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan is and shall be deemed a good-faith compromise and settlement of all claims, interests, and controversies belonging to the Debtors that are being settled under the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such claims, interests, and controversies belonging to the Debtors, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates, and is fair, equitable, and reasonable. The compromises, settlements, and releases described in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Creditor Litigation Trustee and the Debtor Liquidating Trustee or Plan Administrator, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and the Retained Causes of Action.

### iv.    Discharge of Claims and Termination of Interests

Upon entry of the Confirmation Order, and except as otherwise provided in the Plan, the Debtors shall be discharged to the fullest extent permitted by section 1141(d) of the Bankruptcy Code.

### v.    Releases

Refer to Article I.C herein.

### vi.    Exculpation

Refer to Article I.C herein.

### vii.    Injunction

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Buyer, the Required Consenting Noteholders, the Creditor Litigation Trustee and the Debtor Liquidating Trust, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral,**

**administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Buyer, the Creditor Litigation Trust, the Debtor Liquidating Trust, or the property of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Assets purchased by the Buyer authorized by the Sale Order (if any); (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Buyer, the Creditor Litigation Trust, the Debtor Liquidating Trust, or the property of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Assets purchased by the Buyer authorized by the Sale Order (if any); (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor's, the Buyer or the Creditor Litigation Trust, the Debtor Liquidating Trust, or the property of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Assets purchased by the Buyer authorized by the Sale Order (if any); and (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Buyer or the Creditor Litigation Trust, the Debtor Liquidating Trust, or the property of the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, the Debtor Liquidating Trust, or the Assets purchased by the Buyer authorized by the Sale Order (if any), or property to be distributed under the Plan, except as to any setoff exercised in the Bankruptcy Court before the Plan is confirmed, or as contemplated or Allowed by the Plan.**

**By failing to object to the Plan, each Holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Article VIII.G of the Plan.**

**The injunctions in Article VIII.G of the Plan shall extend to any successors of the Debtors (including the Creditor Litigation Trust and the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable), the Reorganized Debtors, the Buyer and their respective property and interests in property.**

> *viii.* **Subordination Rights**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any Distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined. The provisions of any statutory, contractual or structural subordination of Claims shall remain enforceable by the Creditor Litigation Trust and Debtor Liquidating Trust on behalf of the Estates after the occurrence of the Effective Date. The provisions of any statutory, contractual or structural subordination of Claims shall remain enforceable by the Creditor Litigation Trust and Debtor Liquidating Trust or Post-Effective Date Debtor(s), as applicable, on behalf of the Estates after the occurrence of the Effective Date.

*ix.*        **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Buyer, the Creditor Litigation Trustee, the Debtor Liquidating Trustee, the Reorganized Debtors, the Post-Effective Date Debtor(s), or the Plan Administrator, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Creditor Litigation Trust, the Debtor Liquidating Trustee, the Buyer, the Reorganized Debtors, the Post Effective Date Debtor(s), or the Plan Administrator (as applicable), and its (or their) successors and assigns. On and after the Effective Date, the Debtors, the Buyer, the Creditor Litigation Trustee, the Debtor Liquidating Trustee, the Reorganized Debtors, the Post-Effective Date Debtor(s), or the Plan Administrator, as applicable (and any of their respective agents or attorneys), shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases, or such other forms or release documents as may be necessary or appropriate to evidence such releases and implement the provisions of Article VIII.I of the Plan.

**H.        Conditions Precedent to Consummation of the Plan**

*i.*        **Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

a.    the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be in full force and effect and not have been stayed pending appeal;

b.    the Professional Fee Account shall have been established and funded in Cash with the Professional Fee Escrow Agent in accordance with Article II.B.2 of the Plan;

c.    the Indenture Trustee Fees and Expenses and Consenting Noteholder Group Advisors Fees and Expenses shall have been paid;

d.    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

e.    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

f.    the Sale Transaction Documents, as applicable, shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein and to consummation of the Sale Transaction have been satisfied or waived in accordance therewith and (ii) be in full force and effect and binding upon the relevant parties; and

g.    the Sale Transaction shall have been consummated.

54

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously with the other conditions precedent to the Effective Date; *provided, further, that*, to the extent a condition precedent (a "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

> ii.       **Waiver of Conditions**

The conditions to the Effective Date of the Plan set forth in Article IX of the Plan may be waived (i) only by the Debtors; (ii) with respect to the conditions set forth in Article IX.A.1.a, d, e, f, and g, only with the consent of the Buyer, the Ad Hoc Committee of Noteholders, the Creditors' Committee, and the Plan Sponsor; and (iii) solely with respect to Article IX.A.1.c, the Ad Hoc Committee of Noteholders.

> iii.      **Substantial Consummation**

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

> iv.      **Effect of Non-Occurrence of Conditions to the Effective Date**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in any Debtor; (ii) prejudice in any manner the rights of any Debtor, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by any Debtor, any Holders, or any other Entity in any respect.

> I.       **Modification, Revocation, or Withdrawal of The Plan**

> i.       **Modification and Amendments**

1.       Plan Modifications.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims or Allowed Interests pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

2.       Other Amendments.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### ii.  Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the date hereof and before confirmation are approved pursuant to section 1127(a) of the Bankruptcy Code.  Any modifications made after confirmation and before substantial consummation of the Plan shall be subject to section 1127(b) of the Bankruptcy Code.

### iii.  Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission of any sort by any Debtor or any other Entity.

## J.  Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction:

1.      to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases, including disputes arising from the assumption or rejection of Executory Contracts, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

2.      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on, or commenced after, the Confirmation Date;

3.      to ensure that Distributions to Holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely paid;

4.      to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

5.      to consider and adjudicate any motion to estimate a reserve for any Claim or Class of Claims and to set a reserve with respect to such Claims or Classes of Claims;

6.      to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

56

7.      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

8.      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

9.      to hear and determine all Professional Fee Claims and disputes in respect of Indenture Trustee Fees and Expenses, if any;

10.      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, Sale Transaction, the Sale Transaction Documents, the Sale Order (if any), or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

11.      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

12.      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

13.      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

14.      to hear, adjudicate, decide, or resolve any and all matters related to Article VIII of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

15.      to resolve disputes concerning Disputed Claims or the administration thereof;

16.      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

17.      to enter one or more final decrees closing the Chapter 11 Cases;

18.      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

19.      to resolve any disputes regarding whether any party is entitled to postpetition interest, and if so, the applicable interest rate;

20.      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Cost, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

21.      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust or the Debtor Liquidating Trust pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

22.     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code; and

23.     to hear and determine any Retained Causes of Action which the Creditor Litigation Trust may choose to bring in the Bankruptcy Court and any other matters related to or concerning the Creditor Litigation Trust, including, but not limited to, (i) motions to extend the term of such trust, and (ii) Bankruptcy Rule 2004 examination motions brought by the Creditor Litigation Trust in respect to its investigation of the Retained Causes of Action.

## K.     **Miscellaneous Provisions**

### i.     **Payment of Statutory Fees**

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtor Liquidating Trustee or the Post-Effective Date Debtor(s), as applicable, shall pay any and all Quarterly Fees, as when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtor Liquidating Trustee or the Plan Administrator, as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Post-Effective Date Debtor(s), and the Debtor Liquidating Trust, as applicable, shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

### ii.     **Plan Supplement**

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent.

### iii.     **Immediate Binding Effect**

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Post-Effective Date Debtor(s), the Creditor Litigation Trust, and the Debtor Liquidating Trust, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

*iv.*        **Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*v.*        **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

*vi.*        **Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, Creditors' Committee, the Ad Hoc Committee of Noteholders, the Indenture Trustee, the Plan Sponsor, or the U.S. Trustee shall be served on:

**The Debtors**
Nogin, Inc.
105 E 34th Street, Suite 137
New York, NY 10016
Attention: Mike Bassiri

Email:  Mbassiri@nogin.com

**Counsel for the Debtors**
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE  19801
Attention: Daniel J. DeFranceschi
              John H. Knight
              Michael J. Merchant
              David T. Queroli
              Matthew P. Milana

Email:      defranceschi@rlf.com
              knight@rlf.com
              merchant@rlf.com
              queroli@rlf.com

**Counsel to the Plan Sponsor**
Choate Hall & Stewart
Two International Place
Boston, MA  02110
Attention: John F. Ventola
              M. Hampton Foushee

Email:      jventola@choate.com;
              hfoushee@choate.com

and

Cole Schotz, P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Attention: Patrick Reilley

Email: preilley@coleschotz.com

**Consenting Noteholder Group Advisors**
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Facsimile: (212) 209-4801
Attention: Robert J. Stark

milana@rlf.com

Bennett S. Silverberg

**The Indenture Trustee**
U.S. Bank Trust Company, National Association
100 Wall Street, Suite 600
New York, NY 10005
Attention: Justin Shearer

Email:      justin.shearer@usbank.com

Email:      rstark@brownrudnick.com
             bsilverberg@brownrudnick.com

and

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Attention: Steven B. Levine
             Sharon I. Dwoskin

**Counsel for the Indenture Trustee**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attention: Kathleen M. LaManna
             Nicole Lapenta

Email:      klamanna@goodwin.com
             nlapenta@goodwin.com
             bankruptcy@goodwin.com
             bankruptcyparalegal@goodwin.com

Email:      slevine@brownrudnick.com
             sdwoskin@brownrudnick.com

and

Lewis Brisbois Bisgaard & Smith LLP
500 Delaware Ave., Suite 700
Wilmington, DE 19801
Attention: Scott Cousins

Email:    scott.cousins@lewisbrisbois.com

**Office of the United States Trustee**
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
Attention: Jane Leamy

Email:      jane.m.leamy@udsoj.gov

**Counsel to the Creditors' Committee**
Morris James LLP,
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Attention: Eric Monzo
             Brya M. Keilson
             Jason S. Levin

Email:      emonzo@morrisjames.com
             bkeilson@morrisjames.com
             jlevin@morrisjames.com
and

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Jeffrey Cohen
             Eric S. Chafetz
             Brittany M. Clark

Email:      jcohen@lowenstein.com
             echafetz@lowenstein.com

bclark@lowenstein.com

and

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention: Brent I. Weisenberg

Email:      bweisenberg@lowenstein.com

### vii.        Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### viii.        Entire Agreement

The Plan, Plan Supplement, and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### ix.        Nonseverability of Plan Provisions

If, prior to the Confirmation Hearing, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, which request shall be consistent with the terms of the Restructuring Support Agreement (so long as such agreement has not been terminated), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted _provided_, _that_, any such alteration or interpretation shall be reasonably acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent (such consent not to be unreasonably withheld, conditioned, or delayed) from the Debtors; and (iii) nonseverable and mutually dependent.

### x.        Dissolution of Committee

On the Effective Date, any official committees appointed in the Chapter 11 Cases shall dissolve; _provided_, _that_, following the Effective Date, such committee shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, such committee members and their respective professionals shall cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

# VII.
# CERTAIN RISK FACTORS TO BE CONSIDERED

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

Holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

Although the Debtors believe that these Chapter 11 Cases will not be materially disruptive to their business, the Debtors cannot be certain of that because, for example, the Effective Date could be prolonged in connection with satisfying the closing conditions under the Plan.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  It is also possible that the bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation.  Moreover, the Debtors can make no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose whether to, or not to, confirm the Plan.

#### 3.    Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.B of the Plan, then the Confirmation Order may be vacated, in which event no Distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

#### 4.    Risk Related to Possible Objections to Plan

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan.  While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5.      **Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

6.      **Conversion to Chapter 7**

If a chapter 11 plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. If such conversion were to occur, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Article XI.B herein for a further discussion on conversion to a case under chapter 7 of the Bankruptcy Code.

7.      **Conditions to Sale Transaction May Not Be Satisfied**

The Sale Transaction is likely to be subject to the satisfaction or waiver of certain closing conditions to be set out in the Stock Purchase Agreement (or, if applicable, the Asset Purchase Agreement) (the "**Closing Conditions**"). There is no assurance that the Closing Conditions will be satisfied or waived. The failure to satisfy or waive the Closing Conditions, could (i) result in the inability to close the Sale Transaction; and/or (ii) jeopardize consummation of the Plan.

B.      **Additional Factors**

1.      **Claims Could be More than Projected**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and that variation may be material.

2.      **Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect, and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

3.      **Debtors Could Withdraw the Plan**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

4. **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

5. **No Representations Outside Disclosure Statement are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

6. **No Reliance on Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation Hearing or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7. **No Legal or Tax Advice is Provided by Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine whether to object to confirmation of the Plan.

8. **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

9. **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, *see* Article VI.D of the Plan.

**VIII.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, or holders of Interests.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed Treasury regulations thereunder, judicial authorities, published administrative rules and

pronouncements of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (such as non-U.S. persons, broker-dealers, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated investment, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The discussion assumes, except where otherwise indicated, that (i) the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.***

###### A. Consequences to Debtors

Nogin and Nogin Commerce are Delaware Corporations. Native Brands is a California limited liability company. Pursuant to the Plan, the Buyer will acquire newly issued shares representing 100% of Reorganized Debtors and, thus effectively, all of the assets of the Debtors other than the Excluded Assets under the Sale Transaction Documents, in exchange for the consideration, to be distributed pursuant to the Plan. Any Excluded Assets and a portion of the consideration will be transferred to the Creditor Litigation Trust, the Debtor Liquidating Trust or the Post-Effective Date Debtor(s), as applicable. In accordance with the Plan, the Creditor Litigation Trust and, to the extent formed, the Debtor Liquidating Trust are generally intended to be treated as separate "liquidating trusts" for U.S. federal income tax purposes. *See* Sections VIII.B and VIII.C below.

For U.S. federal income tax purposes, the Debtors should be treated as (i) selling all of their Assets (other than any Excluded Assets) to the Buyer and (ii) exchanging any Excluded Assets for the Allowed Senior

Notes Claims or Allowed Claims, as applicable, by the Debtors. It is also possible that the implementation of the Plan may result in the recognition of income from the cancellation of debt.

### B.    Tax Treatment of a Liquidating Trust and Liquidation Trust Beneficiaries

#### 1.    Classification of Creditor Litigation Trust as a Liquidating Trust

As discussed above, the intended form for the Creditor Litigation Trust is a "liquidating trust" for U.S. federal income tax. The following further discusses the U.S. federal income tax consequences of the Creditor Litigation Trust being formed as a liquidating trust.

In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Creditor Litigation Trust will be structured with the intention of complying with such general criteria. In such event, pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtor, the Creditor Litigation Trustee, and the Creditor Litigation Trust Beneficiaries) will be required to treat the transfer of assets to the Creditor Litigation Trust as (i) the deemed receipt of the Creditor Litigation Trust Assets (subject to any applicable liabilities and obligations) by the Holders of Allowed Senior Notes Claims, followed by (ii) the deemed transfer of such assets to the Creditor Litigation Trust. Accordingly, the holders of Allowed Senior Notes Claims will be treated for U.S. federal income tax purposes as the grantors and owners of the Creditor Litigation Trust.

Although the Creditor Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes, the Debtors do not currently intend to request a ruling from the IRS concerning the tax status of the Creditor Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Creditor Litigation Trust as a liquidating trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Creditor Litigation Trust and the holders of Senior Notes Claims could vary from those discussed herein.

#### 2.    General Tax Reporting by a Liquidating Trust and Liquidation Trust Beneficiaries

Because the Creditor Litigation Trust is intended be structured to qualify as a "liquidating trust" for U.S. federal income tax purposes, the Plan provides that, for all U.S. federal income tax purposes, all parties must treat the Creditor Litigation Trust as a grantor trust of which the Creditor Litigation Trust Beneficiaries are the owners and grantors. The Creditor Litigation Trustee will file tax returns for the Creditor Litigation Trust treating it as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Creditor Litigation Trustee also shall annually send to each Creditor Litigation Trust Beneficiary a separate statement regarding the receipts and expenditures of the Creditor Litigation Trust as relevant for U.S. federal income tax purposes.

All items of income, deductions, and credit loss of the Creditor Litigation Trust shall be allocated for federal income tax purposes to the Creditor Litigation Trust Beneficiaries in such manner as the Creditor Litigation Trustee deems reasonable and appropriate.

As soon as reasonably practicable after the transfer of the assets to the Creditor Litigation Trust, the Creditor Litigation Trustee (or its designee) will make a good faith valuation of the assets of the Creditor Litigation Trust. All parties to the Creditor Litigation Trust (including, without limitation, the Debtors, and the

Creditor Litigation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes.

The U.S. federal income tax obligations of a Creditor Litigation Trust Beneficiary are not dependent on the Creditor Litigation Trust distributing any cash or other proceeds. Thus, it is possible that a Creditor Litigation Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of trust income in excess of allocable trust expenses even if the Creditor Litigation Trust does not make a concurrent distribution to the Creditor Litigation Trust Beneficiary. In general, a distribution of cash by the Creditor Litigation Trust to the Creditor Litigation Trust Beneficiaries will not be separately taxable since the Creditor Litigation Trust Beneficiaries will already be regarded for U.S. federal income tax purposes as owning the underlying assets (and be taxed at the time the cash is earned or received by the Creditor Litigation Trust).

The Creditor Litigation Trust will comply with all applicable governmental withholding requirements. If any of the Creditor Litigation Trust Beneficiaries are *not* U.S. persons, the Creditor Litigation Trustee could be required to withhold U.S. income taxes from any payment, depending on the circumstances and subject to treaty terms, if applicable. **As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in a liquidating trust**.

### C.    Tax Treatment of a Liquidating Trust and Liquidation Trust Beneficiaries

#### 1.    Classification of Debtor Liquidating Trust as a Liquidating Trust

As discussed above, the intended form for the Debtor Liquidating Trust is a "liquidating trust" for U.S. federal income tax purposes unless the initial Debtor Liquidating Trust Assets consist solely of cash or cash equivalents. The following further discusses the U.S. federal income tax consequences of the Debtor Liquidating Trust being formed as a liquidating trust.

In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtor Liquidating Trust will be structured with the intention of complying with such general criteria. In such event, pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtor, the Debtor Liquidating Trustee, and the Debtor Liquidating Trust Beneficiaries) will be required to treat the transfer of assets to the Debtor Liquidating Trust as (i) a transfer of such assets (subject to any obligations relating to those assets) directly to the Holders of Allowed Claims that receive Debtor Liquidating Trust Beneficial Interests (based on the relative economics of their Debtor Liquidating Trust Beneficial Interests), followed by (ii) the transfer by such Holders to the Debtor Liquidating Trust of the assets in exchange for such interests in the Debtor Liquidating Trust. Accordingly, except in the event of contrary definitive guidance the Holders of Allowed Claims (other than Allowed Senior Notes Claims) will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Debtor Liquidating Trust's assets.

Although the Debtor Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes, the Debtors do not currently intend to request a ruling from the IRS concerning the tax status of the Debtor Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Debtor Liquidating Trust as a liquidating trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Debtor

Liquidating Trust and the holders of Allowed Claims (other than Allowed Senior Notes Claims) could vary from those discussed herein.

2. **General Tax Reporting by a Liquidating Trust and Liquidation Trust Beneficiaries**

Because the Debtor Liquidating Trust is intended be structured to qualify as a "liquidating trust" for U.S. federal income tax purposes (unless the Debtor Liquidating Trust Assets consists solely of cash or cash equivalents), the Plan provides that, for all U.S. federal income tax purposes, all parties must treat the Debtor Liquidating Trust as a grantor trust of which the Debtor Liquidating Trust Beneficiaries are the owners and grantors, and treat the Debtor Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Debtor Liquidating Trust's assets, consistent with their economic interests therein. The Debtor Liquidating Trustee will file tax returns for the Debtor Liquidating Trust treating it as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The Debtor Liquidating Trustee also shall annually send to each Debtor Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the Debtor Liquidating Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the Debtor Liquidating Trust among the Debtor Liquidating Trust Beneficiaries will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Debtor Liquidating Trust had distributed all its assets (valued at their tax book value) to the Debtor Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Debtor Liquidating Trust. Similarly, taxable loss of the Debtor Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Debtor Liquidating Trust. The tax book value of the Debtor Liquidating Trust's assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of such assets to the Debtor Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the assets to the Debtor Liquidating Trust, the Debtor Liquidating Trustee (or its designee) will make a good faith valuation of the assets of the Debtor Liquidating Trust. All parties to the Debtor Liquidating Trust (including, without limitation, the Debtors, holders of Allowed Claims, and the Debtor Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Debtor Liquidating Trust Beneficiary will be treated as income or loss with respect to such Debtor Liquidating Trust Beneficiary's undivided interest in the Debtor Liquidating Trust's assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Debtor Liquidating Trust Beneficiary.

The U.S. federal income tax obligations of a Debtor Liquidating Trust Beneficiary are not dependent on the Debtor Liquidating Trust distributing any cash or other proceeds. Thus, a Debtor Liquidating Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of trust income even if the Debtor Liquidating Trust does not make a concurrent distribution to the Debtor Liquidating Trust Beneficiary. In general, a distribution of cash by the Debtor Liquidating Trust to the Creditor Litigation Trust Beneficiaries will not be separately taxable since the Debtor Liquidating Trust

Beneficiaries will already be regarded for U.S. federal income tax purposes as owning the underlying assets (and be taxed at the time the cash is earned or received by the Debtor Liquidating Trust).

The Debtor Liquidating Trust will comply with all applicable governmental withholding requirements. If any of the Debtor Liquidating Trust Beneficiaries are *not* U.S. persons, the Debtor Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). **As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in a liquidating trust**.

### D.    Withholding on Distributions and Information Reporting

All distributions under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

*The foregoing summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. In addition, there may be other material income tax considerations, risks and uncertainties associated with the Plan. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan*.

### IX.
### VOTING PROCEDURES AND REQUIREMENTS

On January 22, 2024, the Bankruptcy Court entered the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation, Voting, and Tabulation Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Debtors' Proposed Assumption and Assignment Procedures. and (VI) Granting Related Relief*, [Docket No. 201], (the "**Disclosure Statement Order**"). The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the deadline for voting, which Holders of Claims are eligible to receive ballots to vote on the Plan, and other voting procedures.

**YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THIS DISCLOSURE STATEMENT, THE PLAN, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION BEFORE YOU CAST YOUR VOTE TO ACCEPT OR REJECT THE PLAN, AS THEY SET**

**FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.  A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u>.**

Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the Debtors and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable, except as otherwise set forth in the Plan.  The Plan does not contemplate substantive consolidation of any of the Debtors.

This Section is qualified in its entirety by the Disclosure Statement Order.

### A.    <u>Voting Instructions and Voting Deadline</u>

Holders of Claims in Class 3 (Senior Notes Claims) are entitled to vote to accept or reject the Plan.  All holders of Senior Notes Claims have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

Each ballot contains detailed voting instructions.  Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating ballots.  The record date for determining which holders are entitled to vote on the Plan is January 16, 2024 (prevailing Eastern Time) (the "**Voting Record Date**").

Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return the completed ballot in accordance with the instructions set forth on the ballot.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN FEBRUARY 22, 2024, AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS.  ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR BALLOT MAY DISQUALIFY YOUR BALLOT AND YOUR VOTE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE VOTING AGENT (I) BY CALLING 1-800-761-6523 (TOLL FREE IN THE U.S.) OR 1-877-739-9988 (INTERNATIONAL); OR (II) BY EMAIL AT DRCVOTE@DONLINRECANO.COM.

### B.    <u>Parties Entitled to Vote</u>

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of

such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

The Claims in Class 3 (Senior Notes Claims) are impaired under the Plan and entitled to vote to accept or reject the Plan: Claims in all other Classes are either unimpaired under the Plan and presumed to accept the Plan or will not receive a Distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article I.B of this Disclosure Statement.  As Class 3 is the only impaired Class entitled to vote on the Plan, the Debtors will be unable to confirm the Plan if Class 3 votes to reject the Plan.  **The Debtors support the Plan and urge holders of Claims in Class 3 to vote to accept the Plan.**

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all holders of Claims or Interests in Class 4 (General Unsecured Claims) and Class 6 (Interests).  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article X.C.ii of this Disclosure Statement.

### C.    Agreements Upon Furnishing of Ballots

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Articles VIII.E, F, & G therein.  All parties in interest retain their right to object to confirmation of the Plan.

### D.    Change of Vote

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

E.    **Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors. The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

F.    **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## X.
## CONFIRMATION OF PLAN

A.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Debtors will request that the Bankruptcy Court schedule a hearing to consider: (i) confirmation of the Plan and (ii) any objections thereto (the "**Confirmation Hearing**"). Subject to the Bankruptcy Court's availability, the Confirmation Hearing will be held on **February 29, 2024 at 10:00 a.m. (prevailing Eastern Time)**. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

B.    **Objections to Confirmation and Final Approval of Disclosure Statement**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to the confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline on **February 22, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**"). Objections, if any, to the confirmation of the Plan (including objections to the releases and exculpation provisions provided therein) must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the relevant Debtor's estate or property; (iv) set forth the basis for the objection and the specific grounds therefor, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; and (v) be filed, together with proof

of service.  Registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.  Pursuant to Bankruptcy Rule 3017, any objection or response must also be served upon and received by the following parties no later than the Objection Deadline:

**The Debtors**
Nogin, Inc.
105 E 34th Street, Suite 137
New York, NY 10016
Attention: Mike Bassiri

Email:  Mbassiri@nogin.com

**Counsel for the Debtors**
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE  19801
Attention: Daniel J. DeFranceschi
John H. Knight
Michael J. Merchant
David T. Queroli
Matthew P. Milana

Email:  defranceschi@rlf.com
knight@rlf.com
merchant@rlf.com
queroli@rlf.com
milana@rlf.com

**The Indenture Trustee**
U.S. Bank Trust Company, National Association
100 Wall Street, Suite 600
New York, NY 10005
Attention:  Justin Shearer

Email:  justin.shearer@usbank.com

**Counsel for the Indenture Trustee**
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attention:  Kathleen M. LaManna
Nicole Lapenta
Email:  klamanna@goodwin.com
nlapenta@goodwin.com
bankruptcy@goodwin.com
bankruptcyparalegal@goodwin.com

**Counsel to the Plan Sponsor**
Choate Hall & Stewart
Two International Place
Boston, MA  02110
Attention: John F. Ventola
M. Hampton Foushee

Email:  jventola@choate.com;
hfoushee@choate.com

and

Cole Schotz, P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Attention: Patrick Reilley

Email: preilley@coleschotz.com

**Consenting Noteholder Group Advisors**
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Facsimile: (212) 209-4801
Attention: Robert J. Stark
Bennett S. Silverberg

Email:  rstark@brownrudnick.com
bsilverberg@brownrudnick.com

and

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Attention: Steven B. Levine
Sharon I. Dwoskin

Email:  slevine@brownrudnick.com
sdwoskin@brownrudnick.com

73

**Office of the United States Trustee**
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
Attention:  Jane Leamy

Email:    jane.m.leamy@udsoj.gov

and

Lewis Brisbois Bisgaard & Smith LLP
500 Delaware Ave., Suite 700
Wilmington, DE 19801
Attention: Scott Cousins

Email: scott.cousins@lewisbrisbois.com

**Counsel to the Creditors' Committee**
Morris James LLP,
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Attention: Eric Monzo
            Brya M. Keilson
            Jason S. Levin

Email:    emonzo@morrisjames.com
          bkeilson@morrisjames.com
          jlevin@morrisjames.com
and

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Jeffrey Cohen
            Eric S. Chafetz
            Brittany M. Clark

Email:    jcohen@lowenstein.com
          echafetz@lowenstein.com
          bclark@lowenstein.com

and

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention: Brent I. Weisenberg

Email:    bweisenberg@lowenstein.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

RLF1 30467717V.1

C.    **Requirements for Confirmation of Plan**

    (i)    **Requirements of Section 1129(a) of Bankruptcy Code**

    (a)    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

    (i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

    (ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

    (iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

    (iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

    (v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, including any Creditor Litigation Trustee, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

    (vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

    (vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each other Class of Claims either accepted the Plan or is not impaired under the Plan;

    (viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or

deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(xi)    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, if any, confirmation of a plan requires that each such holder either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing to holders of Claims an Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the debtors demonstrate that confirmation of a plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan. As noted above, the Plan provides for the Reorganized Debtors to be sold to a third-party purchaser under the Sale Transaction, subject to the Senior Notes ability to credit bid the Senior Notes Claims. Further, under the aforementioned transaction, all remaining assets

76

of the Debtors not sold in connection with the Sale Transaction will be placed in a litigation trust which will be followed by a liquidation of the Creditor Litigation Trust Assets, resolution of any outstanding and/or disputed claims, and the winding down of the Debtors' Estates thereafter.   Since the Plan provides for the wind-down of the Debtors' Estates following the Sale Transaction, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and the Debtors otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Creditor Litigation Trustee to administer the liquidation of the Debtors' remaining assets, resolve any outstanding and/or disputed claims, pay Quarterly Fees, tax returns and its professionals.   Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code. Moreover, Section VII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

### (ii) Additional Requirements for Non-Consensual Confirmation Under Section 1129(b) of the Bankruptcy Code

In the event that any impaired Class of Claims or Interests does not accept, or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code.   Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Holders of Claims in Class 4 are not expected to receive, and Holders of Interests in Class 6 will not receive, any distributions and are thereby deemed to reject the Plan.   However, the Debtors submit that the Plan satisfies the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

#### (a) Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.   A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.   This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

#### (b) Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured), and includes the general requirement that no class of claims receive more than 100% of the allowed amount of claims in such class.   As to dissenting classes, the test sets different standards depending on the type of claims in such class.   The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to the Holders of Claims in Class 4 and Holders of Interests in Class 6.

##### (i) Other Secured Claims

Each holder of an Other Secured Claim (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date

of the plan, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)      Unsecured Claims

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured Claim receives or retains under the plan, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan. General Unsecured Claims in Class 4 will be Impaired and are not expected to receive any distribution under the Plan unless there is an Excess Recovery. Because all existing Equity Interests in the Debtors will be cancelled, and because Holders of Equity Interests will not receive any distributions on account of such Equity Interest under the Plan, notwithstanding that Holders of General Unsecured Claims will receive no distribution under the Plan, the Plan nevertheless meets the "fair and equitable" test with respect to holders of Claims in Class 4.

(iii)      Equity Interests

With respect to a class of Equity Interests, either (i) each holder of an Equity Interest will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of Equity Interests that are junior to any dissenting class of equity interests will not receive any property under the Plan. Pursuant to the Plan, no holders of Equity Interests will receive a distribution on account of such Equity Interests. Because the value of the Debtors in a liquidation scenario is less than its secured debt, holders of Equity Interests are entitled to no recovery. Moreover, there is no class junior to Equity Interests, and as such, no junior class will receive any distribution under the Plan. Accordingly, the Plan meets the "fair and equitable" test with respect to Equity Interests.

**XI.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN**

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) preparation and presentation of an alternative plan, (ii) liquidation under chapter 7 of the Bankruptcy Code, or (iii) dismissal.

A.      <u>**Alternative Plan**</u>

If the Plan is not confirmed, the Debtors or another party in interest (or if the Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different plan. The Debtors, however, do not believe that there are any practical alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

B.      <u>**Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally,

78

secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining proceeds, according to their respective priorities. Unsecured creditors with the same priority share in such payments Pro Rata to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid. The effect that a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors submit that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases. The Debtors believe that in liquidation under chapter 7, before creditors would receive any potential distribution, the additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets. The assets available for distribution to creditors would be reduced by such additional expenses and by the claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations.

**XII.**
**CONCLUSION AND RECOMMENDATION**

The Debtors believe the Plan is in the best interests of all stakeholders.

Dated:  January 22, 2024

**NOGIN, INC. AND ITS DEBTOR AFFILIATES**

By:     /s/ *Vladimir Kasparov*

      Name:  Vladimir Kasparov
      Title:   Chief Restructuring Officer

RLF1 30467717V.1

**Exhibit A**

**Chapter 11 Plan**

*See* **Docket No. 203**

**<u>Exhibit B</u>**

**Organizational Structure Chart**



**Exhibit C**

**Liquidation Analysis**

RLF1 30467717V.1

LIQUIDATION ANALYSIS FOR NOGIN, INC, et al.

## I.    Introduction

Under the "best interests" of creditors test set as forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the proposed plan satisfies the "best interests" of creditors test, the Debtors, with assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available to claim and interest holders, assuming a hypothetical liquidation of the Debtors (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement, this Liquidation Analysis and in the accompanying notes to the Liquidation Analysis.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for Joint Chapter 11 Plan of Nogin, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") to which the Liquidation Analysis is attached.

## Statement of Limitations

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that could be realized if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis is based on estimated asset and liability values as of November 30, 2023 (except as otherwise indicated). The actual assets available to the Debtors' estates and claims arising in the event of an actual liquidation may differ from the assets assumed to be available pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated claims filed against the Debtors or adjudicated such claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ from the claim amounts used in the Liquidation Analysis.

**Conversion Date and Appointment of a Chapter 7 Trustee**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases were converted to cases under chapter 7 cases on or about March 10, 2024 ("Conversion Date"). On or around the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee ("Chapter 7 Trustee") to oversee the liquidation of the Debtors' assets.

**Deconsolidated Liquidations**

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated, proceeding. The Liquidation Analysis indicates the DIP loan is impaired and there are no recoveries to administrative and priority claims, the senior notes and General Unsecured Claims of the Debtors.

**Global Notes and Assumptions**

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions.

1.  *Significant dependence on unaudited financial statements.* The Liquidation Analysis contains numerous estimates. Proceeds available for recovery are based upon the unaudited financial statements and balance sheets of the Debtors as of November 30, 2023, and are assumed to be substantially the same as of the Conversion Date, unless otherwise noted herein. Recovery percentages from asset sales are based on estimates obtained from discussions with the management team, industry research and prior case experience.

2.  *Chapter 7 liquidation costs and length of liquidation process.* The Liquidation Analysis assumes a conversion to a Chapter 7 proceeding on March 10, 2024.  The liquidation is assumed to occur over approximately 6 months ("Liquidation Period") in order to pursue an orderly sale of substantially all remaining assets, as well as to arrange distributions and otherwise administer and close the estates. In an actual liquidation, the wind-down process and time-period could vary significantly, thereby impacting recoveries. For example, the potential for priority, contingent, and other claims, litigation, rejection costs, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to creditors. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  *Distribution of net proceeds.* Chapter 7 and Chapter 11 Administrative Claim amounts and Priority Claim amounts, professional fees, trustee fees, and other such claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of any proceeds would be made available to pay General Unsecured Claims. Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

| Item | FN | Book value | Chapter 7 Distributable Value | | | |
| | | | Low | | High | |
| | | | Recovery % | Recovery $ | Recovery % | Recovery $ |
|---|---|---|---|---|---|---|
| Cash at Effective Date | 1 | $ 1,927,385 | 100% | $ 1,927,385 | 100% | $ 1,927,385 |
| Inventory | 2 | 3,603,590 | 0% | - | 10% | 360,359 |
| Office Furniture | 3 | 779,029 | 0% | - | 5% | 38,951 |
| Office Equipment | 4 | 431,857 | 0% | - | 5% | 21,593 |
| Other Fixed Assets | 5 | 1,108,726 | 0% | - | 5% | 55,436 |
| IPCO JV | 6 | 8,387,859 | 0% | - | 11% | 898,790 |
| ModCloth JV | 7 | 4,044,067 | 0% | - | 41% | 1,647,332 |
| **Total Distributable Value** | | **$ 23,379,927** | | **$ 1,927,385** | | **$ 4,949,846** |
| Ch. 7 Trustee Fees & Professional Fees | 8 | | | $ 157,822 | | $ 248,495 |
| Ch. 11 Professional Fees | 9 | | | 250,000 | | 250,000 |
| Wind down costs | | | | 50,000 | | 50,000 |
| **Total Liquidation Costs** | | | | **$ 457,822** | | **$ 548,495** |
| **Net Distributable Value** | | | | **$ 1,469,564** | | **$ 4,401,351** |

| Item | FN | Claim $ | Chapter 7 Claim Recovery | | | |
| | | | Low | | High | |
| | | | Recovery % | Recovery $ | Recovery % | Recovery $ |
|---|---|---|---|---|---|---|
| **Senior Secured Superpriority Claims:** | | | | | | |
| DIP Loan | 10 | $ 28,200,000 | 5% | 1,469,564 | 16% | 4,401,351 |
| **Total Senior Secured Superpriority Claims** | | **$ 28,200,000** | **5%** | **1,469,564** | **16%** | **4,401,351** |
| **Secured Claims:** | | | | | | |
| Senior Note Claims | 11 | $ 67,856,181 | 0% | - | 0% | - |
| **Total Secured Claims** | | **$ 67,856,181** | **0%** | **-** | **0%** | **-** |
| **Administrative and Priority Claims:** | | | | | | |
| Tax Claims | 12 | $ 600,000 | 0% | - | 0% | - |
| Accrued Post-Petition AP | 13 | 1,100,000 | 0% | - | 0% | - |
| Accrued Client Remittances | 14 | 5,700,000 | 0% | - | 0% | - |
| **Total Administrative and Priority Claims** | | **$ 7,400,000** | **0%** | **-** | **0%** | **-** |
| **Unsecured Claims and Equity Interests** | | | | | | |
| General Unsecured Claims | 15 | $ 35,000,000 | 0% | - | 0% | - |
| Intercompany Claims | | N/A | 0% | - | 0% | - |
| Existing Equity Interests | | N/A | 0% | - | 0% | - |
| **Total Unsecured Claims and Equity Interests** | | **$ 35,000,000** | **0%** | **-** | **0%** | **-** |
| **Total Claim Recovery** | | | | **$ 1,469,564** | | **$ 4,401,351** |

## Footnotes to Liquidation Analysis

1. Estimated book balance at conversion date based on cash flow forecast as of January 18th.

2. Book value of potentially profitable inventory as of 11/30/23.

3. Book value of owned office furniture as of 11/30/23.

4. Book value of owned office equipment as of 11/30/23.

5. Primarily comprised of IP related to website development.

6. Based on reported value of investment as of 11/30/23. High recovery assumes 100% of

   inventory value is realized, no intangible asset recovery assumed.

7.  Based on book equity value as of 9/30/23. High recovery assumes 100% of inventory value is realized, no intangible asset recovery assumed.

8.  Represents statutory fees entitled to Chapter 7 Trustee estimated in accordance with 11 U.S.C. section 326(a). Also assumes $100K in professional fees for advisors appointed by the Chapter 7 Trustee.

9.  Represents estimated professional fees incurred for the post-effective date wind down consistent with DIP financing post-trigger carveout.

10. DIP balance at Conversion Date excluding Exit Premium.

11. Includes accrued interest through 12/5/23.

12. Represents estimated sales tax outstanding as of the effective date.

13. Represents post-petition accounts payable accrued and unpaid as of the Conversion Date.

14. Represents client remittances accrued and unpaid as of the Conversion Date.

15. Based on a review of the Debtors' books and records, Schedules of Assets and Liabilities, filed proofs of Claim, and estimated lease rejection claims. Subject to change pending further review and reconciliation of claims.